[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 20, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-13776

_____

D. C. Docket No. 04-20520-CV-CMA

ADIS M. VILA,

Plaintiff-Appellant,

versus

EDUARDO J. PADRÓN, individually and in
his official capacity as President of
Miami-Dade Community College, an agency
of the State of Florida,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 20, 2007)

Before BLACK, MARCUS, and KRAVITCH, Circuit Judges.

BLACK, Circuit Judge:

Adis M. Vila, former Vice President of External Affairs for the Miami-Dade

Community College (MDCC or College) appeals the district court's entry of

judgment as a matter of law to Defendant Eduardo Padrón in his official capacity

as MDCC President on Vila's First Amendment retaliation claim brought under 42

U.S.C. § 1983. We are asked to decide whether Padrón failed to renew Vila's

employment contract because she engaged in First-Amendment-protected speech,

criticizing illegal or unethical behavior of Padrón and other officials at MDCC.

We conclude Vila's speech was not protected by the First Amendment and

therefore affirm the district court's grant of judgment as a matter of law.[1]

## I. FACTS ADDUCED AT TRIAL[2]

MDCC hired Vila in June 2002 as the Vice President of External Affairs. At

the time, Vila was a licensed attorney and member of the Florida Bar. Vila held a

policy-making position and reported directly to Padrón. She supervised the

college-wide units of grants, governmental affairs, legal affairs, and cultural affairs

---

[1] Vila raised four other issues on appeal, which we affirm. We have determined the district court did not err in granting summary judgment on Vila's claim against Padrón in his individual capacity. Further, the district court did not abuse its discretion by refusing to reinstate the individual capacity claim or by refusing to allow evidence that other employees had been denied contract renewals for similar reasons. Finally, the court did not abuse its discretion by failing to allow Vila to amend her complaint to add a claim under the Florida Whistle-blower's Act, Fla. Stat. § 112.3187. Vila's motion to amend was made at the last minute and failed to comply with Fed. R. Civ. P. 16(b).

[2] In reviewing a grant of a motion for judgment as a matter of law, we must view the facts and draw all inferences in the light most favorable to Vila, the non-moving party. *Daniel v. City of Tampa*, 38 F.3d 546, 549 (11th Cir. 1994).

and provided high-level strategic planning. She originally served under a temporary contract from June 24, 2002 to June 30, 2002, and was then given a one-year contract from July 1, 2002 to June 30, 2003. The employment contract provided that "[n]o legal cause shall be required of the Board in the event that [Ms. Vila] is not re-employed by the Board . . . after June 30, 2003."

During the time Vila worked at MDCC, she alleges she objected to a number of unethical or illegal behavior of Padrón and the College. Specifically, she objected to actions related to the following projects: (1) the Zimmerman Advertising Contract; (2) the purchase of the Freedom Tower; and (3) the proposed use of MDCC funds to illustrate a poetry book.[3]

A. *Zimmerman Advertising Contract*

The first allegedly unethical issue Vila raised at the College concerned an advertising contract between MDCC and Zimmerman Partners Advertising (Zimmerman). On October 1, 2002, the Miami-Dade College Foundation (Foundation), a private, not-for-profit legal entity, separate from the College, entered into a contract with Zimmerman to conduct an advertising and marketing campaign for MDCC and the Foundation. When MDCC's director of communications approached Vila to discuss the contract, Vila advised him that

---

[3] Vila also complained that the College did not properly notice public meetings as required by Florida law.

Florida law required any contract with MDCC for $25,000 or more to be subject to competitive bidding or requests-for-proposals.

Subsequently, on December 16, 2002, Vila learned the College had entered into a contract with Zimmerman without her knowledge. The contract was not drafted or reviewed by Vila or anyone else in legal affairs, and Vila only learned of the contract because it appeared on the agenda of the Board of Trustees' meeting for December 17. When Vila and college attorney Fleta Stamen reviewed the agenda prior to the meeting, they became concerned that the wording of the agenda item would give the Board the impression Zimmerman was selected after a request-for-proposal. Vila and Stamen sent Dr. Jeffrey Lukenbill, the College Provost, an e-mail explaining that they believed the wording for the agenda item was misleading and that as a matter of law MDCC could not contract for over $25,000 regardless of the contract between Zimmerman and the Foundation. In response to these concerns, Padrón and the director of communications made a presentation to the Board regarding the process by which Zimmerman was hired and explained the terms of the contract between the Foundation and Zimmerman.

B. *Freedom Tower*

Vila also made a number of complaints related to MDCC's possible purchase of the Freedom Tower, a historic building in downtown Miami. In the

fall of 2002, Padrón asked Vila to explore the possibility of purchasing the Freedom Tower. On November 4, 2002, after touring the Freedom Tower, Vila wrote Padrón a letter in which she strongly recommended MDCC negotiate to purchase the building. Vila noted that the owners of the Freedom Tower were willing to make a "gift" to the educational institution that purchased the building.[4] On November 18, 2002, with Padrón's approval, Vila sent the owners a non-binding letter of intent to purchase the Freedom Tower for $10 million. The letter explained that Florida law required two appraisals supporting the value before any agreement could be finalized.

After MDCC decided to formally pursue the purchase of the Freedom Tower, it retained Rene V. Murai to help with negotiations. Vila testified that she voiced concerns about hiring Murai at a College Board of Trustees Real Estate Sub-Committee meeting on December 18, 2002, and directly to Padrón, Murai, and other College officials. Specifically, Vila claims she objected to hiring Murai because (1) Murai's fee was greater than the $175 per hour rate Vila had recently negotiated for outside counsel services, (2) the work could be performed by in-house counsel, and (3) Murai had a conflict of interest because he represented the owners of the Tower on other legal matters. Vila also testified she objected to the

---

[4] Vila later characterized this gift as a "kick-back."

propriety of a "gift" or "kick-back" that was specifically tied to the purchase price. Vila also testified she raised ethical concerns about the source of funds for the purchase of the Freedom Tower. One of her assignments from Padrón was to come up with financing options for the purchase of the Freedom Tower. In the November 4, 2002, letter to Padrón, Vila advised him that facilities matching may be available from the State.[5] Vila claims Padrón planned to transfer $9.5 million from the Community Endowment Fund, a fund created by a tax referendum to benefit Miami-Dade College, to the College's privately-funded Foundation Fund so that he could represent that the funds were "private moneys" eligible for matching. Vila alleges that when she objected to Padrón's plan and explained that only private funds could be matched by state funds, Padrón purposely excluded Vila from further involvement in the transfer.

## C. *Poetry Book*

Vila also objected to the use of MDCC funds to illustrate a College Trustee's daughter's poetry book. According to Vila, the College director of communications approached her to ask if he could use his budget to pay for the illustration of the poetry book. After she told the director it would not be

---

[5] Fla. Stat. § 1011.32 creates a program entitled "Community College Facility Enhancement Challenge Grant Program" that allows a community college to have its privately-raised funds for instructional and community-related capital facilities to be matched by state funding.

6

appropriate, he came back a few weeks later and told her Padrón wanted to find a way to pay for the illustrations. Vila reiterated that it would not be appropriate to use college funds under any circumstances.

D. *Vila's Non-Renewal and Subsequent Lawsuit*

On March 13, 2003, MDCC notified Vila, both in writing and in person, that her employment contract would not be renewed at the end of the one-year term. MDCC placed Vila on paid leave beginning March 30, 2003. After Vila received the non-renewal notice, she made a number of accusations of unethical behavior at MDCC to government agencies, and a number of newspaper articles were written about her allegations. Nonetheless, prior to receiving notice, she did not discuss her accusations of impropriety with any governmental agency, law enforcement agency, or media outlet.

E. *Parties Involved in Vila's Speech*

For the most part, Vila expressed her complaints only to people within the College. Vila testified that all of her speech related to MDCC and was under her jurisdiction and authority as the Vice President of External Affairs. Vila testified she only voiced concerns to one person outside the College before receiving her notice of non-renewal.[6] Vila told former trustee Alberto Cardenas that she had

---

[6] We do not consider then-current members of the College Board of Trustees to be persons "outside" of the College.

7

concerns about the Freedom Tower, including the alleged kick-back and the hiring of Murai. Vila testified:

> [Cardenas] is a lawyer. He's a former board member of Miami-Dade College, and I was so concerned at the time that there were illegal or unethical or improper activities that I told him that I was very, very concerned and that I sought his guidance as to what I should do, and his words to me at the time was be very, very careful.

Vila testified she did not ask Cardenas to keep their conversation confidential, nor did she ask him to speak to Padrón about her concerns. Vila does not know whether Cardenas communicated her concerns to Padrón and has no idea whether her conversation affected the non-renewal decision. Vila did not present Cardenas as a witness at trial.[7]

On March 5, 2004, Vila filed a complaint, seeking relief under 42 U.S.C. § 1983 against Padrón in his official capacity as MDCC President and in his individual capacity. On March 30, 2005, the district court granted summary judgment to Padrón in his individual capacity after finding he was entitled to qualified immunity. Vila's claim against Padrón in his official capacity proceeded to trial. At the end of the close of Vila's evidence, the court entered judgment as a

---

[7] Vila further claims she expressed her concerns to then-current Board of Trustees member Denise Mincey-Mills and told Mincey-Mills that she feared Padrón would retaliate against her for pointing out unethical and illegal activities of the College. Vila did not present Mincey-Mills as a witness.

8

matter of law against Vila. The court determined that Vila's speech at issue was made pursuant to her duties as a high-ranking employee of MDCC and not as a citizen addressing matters of public concern. The court also found that even if there was a "cognizable First Amendment interest . . . , it is outweighed by the interest of Miami-Dade College as a governmental entity and employer in the efficiency of public services." The court entered final judgment in favor of Padrón on June 8, 2005.

## II. STANDARD OF REVIEW

On a First Amendment retaliation claim, this Court reviews a grant of a motion for judgment as a matter of law *de novo* as to the court's legal conclusions, including whether the employee's speech was protected by the First Amendment. *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1282 (11th Cir. 2006). We must "view the evidence in the light most favorable to the non-moving party and if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted." *Daniel v. City of Tampa*, 38 F.3d 546, 549 (11th Cir. 1994) (internal quotations and citation omitted).

## III. DISCUSSION

The law is well established that a state employee may not be discharged in retaliation for speech protected under the First Amendment. *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S. Ct. 2891, 2896 (1987). Nonetheless, a public employee's right to freedom of speech is not absolute. *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989). To set forth a claim of retaliation, a public employee must show: (1) she was speaking as a citizen on a matter of public concern; (2) her interests as a citizen outweighed the interests of the State as an employer; and (3) the speech played a substantial or motivating role in the adverse employment action. *Akins v. Fulton County*, 420 F.3d 1293, 1303 (11th Cir. 2005); *Bryson*, 888 F.2d at 1565-66. If the plaintiff establishes these elements, the burden shifts to the defendant to prove it would have made the same adverse employment decision absent the employee's speech. *Akins*, 420 F.3d at 1303. The first two elements are questions of law that the court decides. *Bryson*, 888 F.2d at 1565. The court must examine the statements at issue and the circumstances under which they are made to determine whether or not there is First Amendment protection. *Morales v. Stierheim*, 848 F.2d 1145, 1148 (11th Cir. 1988).

The threshold question is whether Vila spoke as a citizen on a matter of public concern. When a public employee speaks as an employee on matters of

10

personal interest and not as a citizen upon matters of public concern, the First Amendment is not implicated. *Morris v. Crow*, 117 F.3d 449, 457 (11th Cir. 1997). Likewise, when "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006); *see also Battle v. Bd. of Regents*, 468 F.3d 755, 760 (11th Cir. 2006).

In this case, Vila alleges the College failed to renew her contract in retaliation for her communications that criticized illegal or unethical behavior of Padrón and other officials at MDCC. Vila testified she objected to the following alleged improprieties: (1) the College contracting with Zimmerman without following the proper bidding and request-for-proposal procedures; (2) the use of Murai as outside legal counsel for the purchase of the Freedom Tower; (3) the alleged "gift" or "kick-back" attached to the purchase price of the Freedom Tower; (4) the use of the facilities matching program to fund the purchase of the Freedom Tower; (5) the use of College funds to illustrate a Trustee's daughter's poetry book; and (6) the College's alleged practice of failing to properly notice public meetings.

11

Vila admitted at trial that all of her communications related to the College and were under her jurisdiction and authority as the Vice President of External Affairs. As part of her job duties, Vila was directly in charge of legal affairs and it was her duty to ensure the College followed all laws. Notably, all of Vila's speech raised concerns about the legality of the College's actions. Additionally, with the exception of her conversation with former Board of Trustees member Alberto Cardenas, all of Vila's statements were made to Padrón, MDCC colleagues, or members of the MDCC Board of Trustees. These statements fall squarely within her official job duties and are not protected by the First Amendment. *Garcetti*, 126 S. Ct. at 1960 (holding that when "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes").

The only statement that was not made pursuant to Vila's official job duties relates to her conversation with former Board of Trustees member Alberto Cardenas. Vila testified she told Cardenas she was "concerned . . . that there were illegal or unethical or improper activities" at MDCC and "sought his guidance as to what [she] should do." To determine whether this statement receives First Amendment protection we must decide whether Vila spoke to Cardenas as a citizen on a matter of public concern or as an employee upon matters of personal interest.

12

*Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 1690 (1983). To do this, we look to the "content, form, and context of a given statement, as revealed by the whole record." *Id.* We ask "whether the 'main thrust' of the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was." *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1283 (11th Cir. 2006) (internal citations omitted). Vila testified she spoke privately to Cardenas, a former MDCC Board of Trustee member and fellow lawyer, because she "sought his guidance." Given this context, we conclude Vila did not speak as a citizen on a matter of public concern, and her speech was not protected by the First Amendment. *Connick v. Myers*, 461 U.S. at 146, 103 S. Ct. at 1690.

Because we answer the threshold question of whether Vila spoke as a citizen on a matter of public concern in the negative, Vila's claim for retaliation fails. The district court did not err when it granted judgment as a matter of law.

## IV. CONCLUSION

There is no evidence in this case that Vila made any statements as a citizen on a matter of public concern. Vila's speech was not protected by the First Amendment. We **AFFIRM** the district court's grant of judgment as a matter of law.