[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 08-12345
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 11, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00048-CV-WSD-1

DAISY ABDUR-RAHMAN,
RYAN PETTY,

Plaintiffs-Appellants,

versus

JOHN WALKER,
CHESTER GUDEWICZ, JR.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(May 11, 2009)

Before BARKETT, PRYOR and FARRIS,[*] Circuit Judges.

_____

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

PRYOR, Circuit Judge:

This appeal presents the question whether reports by compliance inspectors of a water and sewer department that "owe[ their] existence" to investigative duties assigned to the inspectors are protected by the First Amendment from managerial discipline. Garcetti v. Ceballos, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960 (2006). Daisy Abdur-Rahman and Ryan Petty, inspectors formerly employed by the Department of Public Works of DeKalb County, Georgia, appeal a judgment on the pleadings against their complaint and in favor of their former supervisors, John Walker and Chester Gudewicz Jr. The inspectors complained that their employment was terminated in retaliation for reporting to their supervisors about the compliance of the county with the Clean Water Act, in violation of rights secured by the whistleblower provision of the Act, 33 U.S.C. § 1367(a), and the First Amendment, 42 U.S.C. § 1983. The inspectors' reports to their supervisors were based on investigations of sewer overflows the inspectors performed as part of their assigned duties. The district court concluded that section 1983 does not provide a private right of action for violations of the Clean Water Act and the job-related reports of the inspectors were not citizen speech protected by the First Amendment. We affirm.

# I. BACKGROUND

In August and September 2004, Abdur-Rahman and Petty commenced work as Compliance Inspectors in the Compliance Unit of the Water & Sewer Department of the Department of Public Works of DeKalb County, Georgia. They were supervised by Gudewicz, who was in turn supervised by Walker. The supervisors instructed the inspectors to write ordinances for the county about the disposal of fat, oil, and grease. Although this responsibility did not require the inspectors to review data about sanitary sewer overflows, the inspectors wanted to inspect that data as part of their work. The inspectors requested the data, but their supervisors resisted their requests. When the inspectors complained, the supervisors accused them of being "too scientific" and "too thorough." Nevertheless, the inspectors persisted in their requests and commenced field inspections of sewer overflows. In November 2004, the supervisors told the inspectors that they were "ruffling too many feathers."

In early 2005, the department expanded the job duties of the inspectors and assigned them the task of "investigating [sanitary sewer overflows] . . . to determine whether grease was the cause." In January and February 2005, the inspectors investigated two sewer overflows: one at Panthersville Road and another at Fairlake Drive. The inspectors allege that, "during the course of their

employment, [they] articulated concerns" that sewer overflows "were not being properly reported" to state authorities and were not cordoned off or bioremediated as required by state and federal laws, and they specifically reported their concerns in January and February 2005 about the sewer overflows at Panthersville Road and Fairlake Drive.

On January 26, 2005, Gudewicz recommended that the employment of the inspectors be terminated because of unsatisfactory work performance. On February 8, Walker approved Gudewicz's recommendation, and on March 11, the inspectors were fired. On April 11, 2005, the inspectors filed a complaint with the Department of Labor against DeKalb County, the supervisors, and other defendants and alleged a violation of the whistleblower provision of the Clean Water Act, 33 U.S.C. § 1367(a). On September 22, 2006, an administrative law judge dismissed all defendants except the county.

In January 2007, the inspectors filed a complaint against the supervisors. 42 U.S.C. § 1983. The inspectors alleged that their supervisors had violated the whistleblower provision of the Clean Water Act, 33 U.S.C. § 1367(a), and the First Amendment. The inspectors alleged that the county "commissioned" them to report about "the causation of [sewer overflows], but not regarding the reporting, remediation, or posting of [sewer overflows]." The inspectors sought

4

constitutional protection for their statements about reporting, bioremediation, and posting.

The supervisors moved for judgment on the pleadings on the grounds that section 1983 does not provide a remedy for violation of the Clean Water Act, the complaint failed to state a claim under the First Amendment, and the supervisors were immune from suit. The district court stayed proceedings pending the outcome of the administrative action. The administrative law judge denied relief on the ground that the inspectors had not proved that they were terminated because they engaged in activity protected by the Clean Water Act. The inspectors appealed to the Administrative Review Board of the Department of Labor, and the district court again stayed proceedings. The supervisors then renewed their motion for judgment on the pleadings, and the district court granted judgment on the pleadings in favor of the supervisors.

## II. STANDARD OF REVIEW

"We review de novo a district court's entry of judgment on the pleadings, accepting the facts in the complaint as true and viewing them in the light most favorable to the nonmoving party." Horsley v. Feldt, 304 F.3d 1125, 1131 (11th Cir. 2002).

# III. DISCUSSION

Our discussion is divided in two parts.  We first discuss why section 1983 does not provide a private right of action for violations of the Clean Water Act. We then discuss our conclusion that the reports of the inspectors were not protected by the First Amendment because the inspectors did not speak as "'citizen[s] on a matter of public concern.'"  Battle v. Bd. of Regents for the State of Ga., 468 F.3d 755, 760 (11th Cir. 2006) (per curiam) (quoting Garcetti, 547 U.S. at 418, 126 S. Ct. at 1958).

## A. Section 1983 Does Not Provide a Right of Action for Violations of the Clean Water Act.

The inspectors' first argument is foreclosed by a longstanding decision of the Supreme Court.  In Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 19, 101 S. Ct. 2615, 2626 (1981), the Supreme Court held that the comprehensive remedies of the Clean Water Act foreclose a private right of action under section 1983.  Although section 1983 provides a right of action for violations of rights secured by the Constitution and laws of the United States and authorizes suits to redress violations by state officials of rights created by federal statutes, Maine v. Thiboutot, 448 U.S. 1, 100 S. Ct. 2502 (1980), section 1983 does not authorize suits when "Congress . . . foreclose[s]

private enforcement of [a] statute in the enactment itself." Sea Clammers, 453 U.S. at 19, 101 S. Ct. at 2626. "When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983," id. at 20, 101 S. Ct. at 2626, and the Court in Sea Clammers described the remedies in the Act as "quite comprehensive," id. The Court stated, "It is hard to believe that Congress intended to preserve the § 1983 right of action when it created so many specific statutory remedies . . . . " Id.

Although the inspectors argue that a private right of action has been recognized by one of our sister circuits, the decision on which they rely, Charvat v. Eastern Ohio Regional Wastewater Authority, 246 F.3d 607 (6th Cir. 2001), does not stand for that proposition. In Charvat, the Sixth Circuit held that the Clean Water Act did not bar a claim under section 1983 that an employer retaliated against an employee in violation of the First Amendment. Id. at 613–16. The Sixth Circuit did not consider whether the Clean Water Act barred a claim under section 1983 that an employer retaliated against an employee in violation of the Act itself. Id. at 614 (citing Sea Clammers, 453 U.S. at 21, 101 S. Ct. at 2615). We affirm the judgment against the inspectors' claim about the whistleblower provision of the Clean Water Act.

*B.  The Reports of the Inspectors Were Not Protected by the First Amendment
Because the Inspectors Did Not Speak as Citizens.*

"[T]he law is well-established that the state may not demote or discharge a public employee in retaliation for speech protected under the [F]irst [A]mendment." Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989), but "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." Garcetti, 547 U.S. at 418, 126 S. Ct. at 1958.  To state a claim that a government employer took disciplinary action in retaliation for constitutionally protected speech, a public employee must prove, as a threshold matter, that the employee "'spoke as a citizen on a matter of public concern.'"  Battle, 468 F.3d at 760 (quoting Garcetti, 547 U.S. at 418, 126 S. Ct. at 1958); see also D'Angelo v. Sch. Bd. of Polk County, Fla., 497 F.3d 1203, 1208–10 (11th Cir. 2007).  This appeal turns on that threshold inquiry.

Three concerns animate the requirement that an employee speak as a citizen to receive constitutional protection for her speech.  First, because "government offices could not function if every employment decision became a constitutional matter," Connick v. Myers, 461 U.S. 138, 143, 103 S. Ct. 1684, 1688 (1983), "[Supreme Court] precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing

8

his or her job." Garcetti, 547 U.S. at 426, 126 S. Ct. at 1962; see also id. at 418–19, 126 S. Ct. at 1958. Constitutional causes of action must be limited to "the kind of activity engaged in by citizens who do not work for the government." Id. at 423, 126 S. Ct. at 1961. Second, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." Id. at 418, 126 S. Ct. at 1958. Because of the unique, trusted position that public employees occupy, they ought not to receive constitutional protection for speech that "express[es] views that contravene governmental policies or impair[s] the proper performance of governmental functions." Id. at 419, 126 S. Ct. at 1958. Third, when complaints under the First Amendment are limited to instances in which a public employee proves that she "spoke as a citizen on a matter of public concern," Battle, 468 F.3d at 760, courts avoid "judicial oversight" of workplace communications and "permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers." Garcetti, 547 U.S. at 423, 126 S. Ct. at 1961.

Garcetti controls our analysis of whether the inspectors spoke as citizens. In Garcetti, the Supreme Court considered whether a memorandum written by

9

Ceballos, a deputy district attorney, about misrepresentations contained in an affidavit used by police to obtain a search warrant was protected by the First Amendment. Id. at 413–17, 126 S. Ct. at 1955–57. The Court identified as relevant two factors that, considered in isolation, are not dispositive: first, whether the speech occurs in the workplace; and second, whether the speech concerns the subject matter of the employee's job. Id. at 420–21, 126 S. Ct. at 1959. The Court reasoned, "That Ceballos expressed his views inside his office, rather than publicly, [wa]s not dispositive[,]" id. at 420, 126 S. Ct. at 1959, because "[m]any citizens do much of their talking inside their respective workplaces, and it would not serve the goal of treating public employees like 'any member of the general public' to hold that all speech within the office is automatically exposed to restriction." Id. at 421, 126 S. Ct. at 1959 (internal citation omitted). The Court reasoned that "the memo concerned the subject matter of Ceballos's employment [also wa]s nondispositive," because the First Amendment protects some job-related expression. Id. The Court cited, for example, its statement in Pickering v. Board of Education of Township High School District 205, Will County, Ill., 391 U.S. 563, 572, 88 S. Ct. 1731, 1736 (1968), that it is "essential" that teachers be able to speak freely about how school funds should be spent. Garcetti, 547 U.S. at 421, 126 S. Ct. at 1959.

"The controlling factor" in Garcetti was that Ceballos's statements were made pursuant to his job duties. Id. at 421, 126 S. Ct. at 1959–60. The Court defined speech made pursuant to an employee's job duties as "speech that owes its existence to a public employee's professional responsibilities," id. at 421, 126 S. Ct. at 1960, and a product that "the employer itself has commissioned or created," id. at 422, 126 S. Ct. at 1960. The Court stated that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 421, 126 S. Ct. at 1960.

The Court stated that a "practical" inquiry is necessary to determine whether speech owes its existence to an employee's professional duties. Id. at 424, 126 S. Ct. at 1961. Formal job descriptions do not control the inquiry because they may "bear little resemblance to the duties an employee actually is expected to perform," and employers may craft broad descriptions to restrict the rights of employees under the First Amendment. Id. at 424–25, 126 S. Ct. at 1961–62. Instead, "[t]o determine whether [a] statement receives First Amendment protection . . . we look to the content, form, and context of a given statement, as revealed by the whole record." Vila v. Padron, 484 F.3d 1334, 1340 (11th Cir. 2007) (internal quotation marks and citation omitted); see also Boyce v. Andrew,

11

510 F.3d 1333, 1343, 1346 (11th Cir. 2007) (reviewing the "form and context in which the complaints by [the employees] were made," and drawing conclusions about the First Amendment claim "[b]ased upon review of the entire record").

In Garcetti, the practical inquiry was straightforward because Ceballos admitted that he wrote the memorandum as part of his job duties. On the basis of this admission, the Court concluded that the memorandum was not protected speech. 547 U.S. at 421, 424, 126 S. Ct. at 1959–60, 1961. The Court declined "to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." Id. at 424, 126 S. Ct. at 1961.

Although our practical inquiry is less straightforward because the inspectors, in the light of Garcetti, do not admit that they spoke pursuant to their official duties, the result is no less clear: the reports of the inspectors to their supervisors about sewer overflows they were required to investigate are not protected under the First Amendment. The inspectors' reports about sewer overflows concerned information they requested and investigations they performed for the purpose of fulfilling their assigned job duties. The inspectors' reports "owe[ their] existence," id. at 421, 126 S. Ct. at 1960, to their official responsibilities and cannot reasonably be divorced from those responsibilities.

12

Although researching sanitary sewer overflows initially was not part of the job duties of the inspectors, the inspectors requested and reviewed data on sanitary sewer overflows as part of their efforts to discharge their enumerated job responsibilities related to the fat, oil, and grease ordinances of DeKalb County. By their own admission, the inspectors researched environmental problems to enhance the effectiveness of environmental controls: the amended complaint states that sanitary sewer overflows were also called "spills," and that the inspectors "undertook to research the existing sanitary sewer overflow . . . problem in DeKalb County so as to ascertain '[sanitary sewer overflow] hotspots' . . . in order to write a better and more effective [fat, oil, and grease] code." Also by their own admission, the inspectors believed that the data they requested were so important to their jobs that, in response to resistance from their supervisors, they complained, persisted in their requests, and even initiated their own field inspections.

In early 2005, the enumerated job duties of the inspectors were expanded to include "investigating [sanitary sewer overflows]" to determine whether grease was the cause of the overflows. The investigation by the inspectors of the two sanitary sewer overflows that form the basis for their complaint occurred in January and February 2005, during and after the expansion of their duties. The

13

inspectors' reports about overflows "owe[ their] existence," Garcetti, 547 U.S. at 421, 126 S. Ct. at 1960, to the two principal job responsibilities of the inspectors: writing fat, oil, and grease ordinances and inspecting sanitary sewer overflows.

The inspectors attempt to distinguish their responsibilities to determine the causes of sanitary sewer overflows from their reports about the bioremediation and posting of overflows, but this distinction is artificial. By their own admission, the inspectors acquired the information and conducted the investigations that formed the basis for their reports to discharge their assigned official responsibilities. The inspectors also did not communicate their concerns to their colleagues in the Construction and Maintenance Unit with primary oversight of compliance issues for sewer overflows; instead, they spoke directly to Gudewicz, their supervisor in the Compliance Unit. This choice suggests that the inspectors did not believe that raising concerns about sewer overflows was exclusively the responsibility of someone else in some other unit of their department and that they did not take a narrow, rigid view of their own responsibilities.

It cannot be that the job duties of the inspectors were so narrow that they encompassed only a portion of the reports their job precipitated. The inspectors concede that their reports about the cause of the sewer overflows are not protected under the First Amendment, and the only portion of their reports for which they

seek protection concerns other aspects of the same sewer overflows. On this logic, certain sentences in a conversation between the inspectors and their supervisors about the inspectors' investigations of sewer overflows were protected, and other sentences were not. This approach parses the inspectors' reports too finely. It is dubious, to say the least, that the inspectors' duties were so narrow that they excluded only the speech for which they now seek constitutional protection. None of the statements in their reports can reasonably be separated from the job duties of the inspectors, and all of their speech "owes its existence to" those duties. Id.

Our precedents require that we reject the distinction the inspectors advocate. We review "the content, form, and context of a given statement, as revealed by the whole record[,]" Vila, 484 F.3d at 1340 (internal quotation marks omitted); Boyce, 510 F.3d at 1343, not whether an employee's job mandated the act of speaking, as revealed by facts considered in isolation. We have consistently discredited narrow, rigid descriptions of official duties urged upon us to support an inference that public employees spoke as private citizens. See D'Angelo, 497 F.3d at 1210–11; Vila, 484 F.3d at 1340; Battle, 468 F.3d at 761 & n.6. If we had examined only whether the employees' official responsibilities required them to speak, we would have reached a different result in D'Angelo, Vila and Battle.

In D'Angelo, we ruled that a high school principal did not speak as a citizen when he worked, on his own initiative, to convert his high school to charter status and was terminated later. 497 F.3d at 1210–11. The principal "testified at trial that charter conversion was not one of [his] assigned duties, but he admitted that [i]t was incumbent upon [him] to . . . move towards [c]harter . . . [because] his number one duty . . . [wa]s to do whatever [he could] for the kids." Id. at 1206 (alteration in original) (internal quotation marks omitted). Like the inspectors in this appeal, the principal in D'Angelo attempted to limit the scope of his admission. He described his responsibility to do what he could for his students as "about [his] moral obligations as a human being and not his responsibilities as a principal," but we rejected that distinction based on our review of the content, form, and context of his speech. Id. at 1210.

In Vila, we examined the "content, form, and context" of reports by a vice president of a community college of illegal and unethical behavior of the president and other employees of the college, and we concluded that the vice president made her reports, save one, pursuant to her job duties. 484 F.3d at 1336–38, 1340. We did not examine whether her job required her to make those reports. Id. at 1340. The vice president made the excluded statement privately to a former trustee of the

16

college and "sought his guidance as to what [she] should do." Id. (alteration in original) (internal quotation marks omitted).

In Battle, we read Garcetti as requiring a functional review of an employee's speech based on her duties in the financial aid office of a public university. Battle, 468 F.3d at 757–59. The contract of that employee was not renewed after she expressed concerns to her supervisors about fraudulent practices in the federal work-study program. Id. The employee admitted that her speech "was made pursuant to her official employment responsibilities[,]" id. at 761, but, like the inspectors in this appeal, the employee "attempt[ed] to limit the scope of her admission" after the Supreme Court decided Garcetti, id. at 761 n.6. The employee "claim[ed] her only employment duties related to her control and oversight of financial aid information provided by certain students, and not to the discovery of fraud by her supervisor." Id. The employee also argued that she had no duty to discover fraud because employees of another agency had that responsibility. Id. These arguments failed.

We rejected the attempt of the employee in Battle to distinguish Garcetti and ignore the content, form, and context of her speech. In the light of federal guidelines charging all financial aid administrators to report suspected fraud, we concluded that even if the employee had no duty to investigate fraud, she was

obligated to report suspected fraud.  Id.  We stated, "The issue in Garcetti was whether a public employee was speaking pursuant to an official duty, not whether that duty was part of the employee's everyday job functions."  Id.

Our refusal to divorce the speech of public employees from their employment context is consistent with the reasoning of the Supreme Court in Garcetti.  The Supreme Court explained that public employees "retain some possibility of" constitutional protection when they "make public statements outside the course of performing their official duties . . . because that is the kind of activity engaged in by citizens who do not work for the government," but the statements of public employees retain their official status when "there is no relevant analogue to speech by citizens who are not government employees." Garcetti, 547 U.S. at 423–24, 126 S. Ct. at 1961.  Speech that owes its existence to the official duties of public employees is not citizen speech even if those duties can be described so narrowly as not to mandate the act of speaking.  In that context, "[t]here is no relevant analogue to speech by citizens who are not government employees," id. at 424, 126 S. Ct. at 1961, and the speech is unprotected.

The inspectors seek constitutional protection for any statement they were not required to make, even if it owed its existence to the performance of their

18

official responsibilities, so they can expand that protection beyond citizen speech. See id. at 423, 426, 126 S. Ct. at 1961, 1962. Their argument is incompatible with the "heightened interests [of a government employer] in controlling speech made by an employee in his or her professional capacity." Id. at 422, 126 S. Ct. at 1960. Under the rule the inspectors advocate, public employees would be free to request nonpublic information under the auspices of their job duties and then gain constitutional protection for whatever statements they desire to make about that information, so long as the employees are able to describe their assigned responsibilities narrowly enough to exclude the act of making those statements. This kind of rule would shift control over official communications from the public employer to the public employee. Because the inspectors seek judicial protection from managerial discipline for statements to their supervisors about information acquired and observations made during the course of performing the inspectors' official duties, the inspectors urge the "displacement of managerial discretion by judicial supervision." Id. at 423, 126 S. Ct. at 1961.

At every turn, the argument of the inspectors is incompatible with the precedents of our Court and the Supreme Court that limit the claims of government employees under the First Amendment to citizen speech on matters of public concern. To remain faithful to these precedents, we must review the whole

record, and we cannot focus exclusively on whether the inspectors were required to speak. We cannot separate the statements the inspectors made from the official responsibilities to which those expressions were related. We affirm the judgment that the inspectors' complaint under the First Amendment fails as a matter of law.

## IV. CONCLUSION

We **AFFIRM** the judgment on the pleadings in favor of Walker and Gudewicz.

BARKETT, Circuit Judge, dissenting:

I dissent, believing that the majority has misapplied First Amendment principles to the facts of this case.

As an initial matter, there is no question that public employees do not surrender their First Amendment speech rights merely by virtue of their employment. See, e.g., Pickering v. Bd. of Educ., 391 U.S. 563, 574 (1968). The right of public employees to comment on issues of public concern – which is grounded in the right of all citizens to participate in political affairs – is so important that the Supreme Court has explained the history of that right as follows:

> The issue was whether government employees could be prevented or chilled by the fear of discharge from joining political parties and other associations that certain public officials might find subversive. The explanation for the Constitution's special concern with threats to the right of citizens to participate in political affairs is no mystery. The First Amendment was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. Speech concerning public affairs is more than self-expression; it is the essence of self-government. Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.

Connick v. Myers, 461 U.S. 138, 145 (1983) (citations and quotations omitted) (emphasis added).[1]

It is with these principles as a foundation that the Supreme Court has nonetheless recognized that the "free speech rights of public employees are not absolute," Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 414 (1979), and that the interests of the government as employer in efficiently managing its offices and personnel might in certain cases outweigh the employee's free speech rights, see Myers, 461 U.S. at 146; Givhan, 439 U.S. at 414.[2]

However, the sacrifice of First Amendment rights by public employees in the interest of managerial efficiency is the exception, not the rule. To that end, the Supreme Court has ensured the broadest possible First Amendment protection for public employees by, among other things, holding specifically that the government's managerial interests do not necessarily outweigh the rights of the employee to speak on a matter of public concern simply because the speech relates

---

[1] Moreover, the law is well established that the State may not demote or discharge a public employee in retaliation for speech protected under the First Amendment. Pickering, 391 U.S. at 574-75 (1968); Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989).

[2] In Myers, for example, the Supreme Court held that when a public employee distributed a questionnaire to her co-workers in an effort to air various issues arising out of a "personal employment dispute," 461 U.S. at 148 n.8, the First Amendment did not require her government supervisor to "tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." Id. at 154.

22

to his or her employment, nor, for that matter, because he speaks to his co-workers or supervisors rather than to the public. See, e.g., Garcetti v. Ceballos, 547 U.S. 410, 420-21 (2006).

The Court has long recognized that the fact that a public employee's speech relates to his job is not dispositive because "[t]he First Amendment protects some expressions related to the speaker's job." Garcetti, 547 U.S. at 421; see also Pickering, 391 U.S. at 572. A logical corollary of this principle, particularly applicable in this case, is that how an employee comes to learn about an issue does not in itself indicate that his subsequent complaint about that issue is pursuant to his job duties. See, e.g., Lindsey v. City of Orrick, Missouri, 491 F.3d 892, 898 (8th Cir. 2007) (city employee whose duties included park, water, and sewer maintenance and reporting on that maintenance at city council meetings was not speaking pursuant to official duties when he complained about violations of city sunshine laws, even though he learned of the violations at the city council meetings he was required to attend). As the Court has noted, speech on public issues cannot be properly safeguarded without some First Amendment protection for speech by public employees on job-related matters, because public employees are better equipped than the average citizen to "have informed and definite

opinions" regarding issues related to their area of employment.  <u>Garcetti</u>, 547 U.S.

at 421.

The Court has also long recognized that the fact that an employee chooses

to speak to his supervisor rather than to the public does not in itself eliminate First

Amendment protection:

> That [the employee] expressed his views inside his office, rather than
> publicly, is not dispositive.  Employees in some cases may receive
> First Amendment protection for expressions made at work. Many
> citizens do much of their talking inside their respective workplaces,
> and it would not serve the goal of treating public employees like any
> member of the general public to hold that all speech within the office
> is automatically exposed to restriction.

<u>Garcetti</u>, 547 U.S. at 420-21 (citations and quotation omitted); <u>see also</u> <u>Givhan</u>,

439 U.S. at 415-16 ("Neither the [First] Amendment itself nor our decisions

indicate that this freedom [of speech] is lost to the public employee who arranges

to communicate privately with his employer rather than to spread his views before

the public.").[3]

---

[3] In light of this clear Supreme Court precedent, I do not agree with the majority that the fact that the employees chose to take their complaints to their supervisors rather than to the press "suggests that the [employees] did not believe that raising concerns about sewer overflows was exclusively the responsibility of someone else in some other unit of their department . . . ."  In addition to the fact that the Supreme Court has said that an employee's choice of forum for speech is not dispositive, this statement is pure speculation, which should not be the basis of an appellate court's decision.  For example, an equally plausible explanation is that the employees went to their supervisors as a matter of courtesy or discretion, or because they did not know who else to talk to, or because they believed their supervisors could most expeditiously bring the matter to the attention of the appropriate person.

Based on these cases, it is clear that public employees are both employees and citizens. Under the First Amendment, an employee/citizen can speak on a matter of public concern that relates to his job or place of employment, and he can address that issue of public concern to the newspaper or to his supervisors. How then do we distinguish between speech in the workplace that is protected under the First Amendment and speech that is not? This is the issue the Supreme Court recently attempted to clarify in Garcetti, when it held that public employees are not speaking in their role as citizens and may therefore constitutionally be subject to managerial discipline when they "make statements pursuant to their official duties." 547 U.S. at 421.

I believe the majority opinion misapplies Garcetti – which did not overrule the framework for analyzing public employee speech cases set forth in, among others, Pickering, Myers, and Givhan – to conclude that the employees' speech regarding sanitary sewer overflow ("SSO" or "spill") reporting, posting, and remediation is unprotected by the First Amendment.

To begin with, the record is undisputed that, unlike in Garcetti, the employees in this case had no official professional duty to report SSOs to state or federal environmental authorities, to post or remediate SSO sites, or to complain about the failure to do any of these things, but did so anyway out of concern for

25

the health and safety of their community.[4]   The employees were members of

DeKalb County's Compliance Unit and were responsible for drafting the County's

fat, oil, and grease ("FOG") ordinances as well as a proposed permitting system.

FOG ordinances are designed to tell the food service industry and the public how

to properly discharge fats, oils, and grease into the county sewer system in order to

prevent sewer blockages and overflows.  The only duty the employees had with

respect to SSOs was to determine whether a particular spill was caused by grease,

which in turn would improve their ability to draft the FOG ordinances for which

they were hired.  The reporting, posting, and remediation of SSO sites was

specifically entrusted to the County's Construction and Maintenance Unit, of

which the employees were not a part.  Therefore, as the record makes clear, the

sole connection between the employees' complaints regarding SSO reporting,

posting, and remediation and their jobs was the fact that the employees happened

---

[4]  The employees complained specifically about (1) SSOs not being properly reported to the Georgia Environmental Protection Division, as required by law; (2) SSO sites not having proper posting; (3) the testing and determination of fish kill at SSO sites for reporting purposes; (4) the calculation of spill gallonage at SSO sites for reporting purposes; (5) SSOs not being properly cordoned off to protect the public from exposure to raw sewage; and (6) SSO sites not being properly bioremediated, causing a potential health hazard to the public.

to be inspecting SSO sites for purposes of their FOG duties when they identified the problems.[5]

The majority brushes off these undisputed facts regarding the limited scope of the employees' duties by repeatedly asserting that because the employees' speech "owe[s] [its] existence to [the employees'] official responsibilities and cannot reasonably be divorced from those responsibilities," the employees' speech is not protected. Thus, the essence of the majority opinion, with its emphasis on Garcetti's phrase "owes its existence to," appears to be that speech about anything a public employee learns about in the course of performing his job – here, the inspection of SSO sites for purposes of ascertaining whether grease was their cause – is unprotected, because the speech would not exist without the job activity. But this is not the holding of Garcetti.

---

[5] The testimony in this case, including that of the supervisors, confirms unequivocally that the employees had no official duties to report, post, or remediate SSO sites. In their amended complaint and their brief to the district court opposing judgment on the pleadings, the employees cite to the testimony elicited during their administrative hearing under the Clean Water Act ("CWA"). Among other things, several of their fellow compliance inspectors confirmed that SSO reporting, posting, and testing did not fall within the responsibilities of the Compliance Unit. Petty testified that when he spoke to his supervisor Gudewicz about his health and safety concerns, Gudewicz told him that Petty's only job with respect to SSOs was to determine whether grease was the "culprit." Gudewicz also testified that he did not know anything about the posting requirements for SSOs until sometime in 2005 and that it was not his responsibility to correct any inaccuracies on the SSO reporting forms. Similarly, Gudewicz's supervisor John Walker testified that the employees had no duties regarding the reporting, posting, or clean-up of SSO sites.

When examined in its proper context, the phrase "owes its existence to" cannot bear the weight the majority accords it. The phrase is found in one passage of the Garcetti opinion, as follows:

> The significant point is that [Ceballos'] memo was written pursuant to Ceballos' official duties. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

547 U.S. at 421-22. In other words, speech owes its existence to an employee's professional responsibilities when the employer has "commissioned or created" it. Id. And, as the Garcetti Court emphasizes throughout the opinion, an employer commissions or creates speech when an employee speaks pursuant to official duties, not when that employee speaks outside of those commissioned duties – that is the "significant point" of the Garcetti opinion. Id.

Rather than focus on the opinion's "significant point," however, the majority broadly applies Garcetti's "owes its existence" language to eliminate constitutional protection for all of the employees' statements regarding SSOs, and in doing so effectively nullifies the Court's admonishment that the fact that speech relates to the subject matter of the employee's job is non-dispositive. See 547 U.S. at 421. This is so because speech that relates to an employee's job – which,

28

according to Garcetti, still retains the possibility of First Amendment protection –

will almost always "owe its existence" to that job.  Therefore, a so-called

"existence" test cannot end the inquiry.  The employees' speech regarding SSO

reporting, posting, and remediation was admittedly prompted by their SSO

research and therefore in a broad sense would likely not have existed without that

research.  However, because the employees were indisputably not responsible for

reporting, posting, or remediating SSOs, their speech on those subjects could not

owe its existence to their official duties, as the Garcetti opinion uses the phrase.

In Garcetti, deputy district attorney Richard Ceballos, acting as a calendar

deputy during the period in question, spoke to his supervisors and a deputy sheriff

about several concerns raised by a defense attorney regarding inaccuracies in an

affidavit written by the deputy sheriff and used to obtain a search warrant.  Id. at

413-14.  Unsatisfied with the explanation he received from the deputy sheriff

about the inaccuracies, Ceballos prepared a case disposition memorandum

explaining his concerns and recommended dismissing the case.  Id.  During a

meeting about the memorandum attended by his supervisors, the deputy sheriff

who had written the affidavit, and other employees from the sheriff's department,

the discussion became heated, "with one lieutenant sharply criticizing Ceballos for

his handling of the case."  Id.  Ceballos's supervisor decided to proceed with the

29

case in spite of Ceballos's recommendation, and Ceballos was then called by the defense to testify during a hearing challenging the warrant. Id. at 414-15. Ceballos claimed that after these events, he was reassigned, transferred, and denied a promotion in retaliation for the memorandum, a violation of his First Amendment right of free speech. Id. at 415.

In rejecting Ceballos's argument, the Court held that "[t]he controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy." Id. at 421. The Court noted that it was not disputed that Ceballos "prepared the memorandum pursuant to his duties as a prosecutor," and that in light of the fact that "Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case," he was speaking as an employee, rather than a citizen, and therefore was not entitled to First Amendment protection from employer discipline. Id. In other words, because Ceballos was not attempting to advise the "public" (through his supervisors, the press, or any other forum) about an issue of public concern, but was simply performing his specific job duties, "his supervisors were [not] prohibited from evaluating his performance." Id. at 422. The issue in Garcetti, as in Myers, was how Ceballos went about performing his job duties, and the effect of his conduct on his office and co-workers, not the content of his speech. Based

30

on <u>Pickering</u> and its progeny, the Court reasoned that "the First Amendment does not prohibit <u>managerial</u> discipline based on an employee's expressions made pursuant to official responsibilities." <u>Id.</u> at 424 (emphasis added).

Thus, speech owes its existence to the employee's official duties – for <u>Garcetti</u> purposes – when something about the speech itself (for example, its content, tone, timing, or target) significantly affects the quality of that employee's job performance, thereby triggering the government employer's managerial or disciplinary rights. <u>See</u> <u>Myers</u>, 461 U.S. at 147. In other words, had the employees been fired after they initially requested SSO data for purposes of doing their jobs (<u>i.e.</u> drafting FOG ordinances), they would not be protected from retaliation by the First Amendment because the <u>way they were doing their jobs</u> had "ruffled feathers."[6] The same cannot be said of speech indisputably not made

___

[6] The majority claims to reject the employees' position in this case in which we examine, for <u>Garcetti</u> purposes, only whether an employee's job duties "mandated the act of speaking, as revealed by facts considered in isolation." This is an incorrect characterization of the employees' position, and mine. There is no question that speech not specifically mandated by an employee's job might nevertheless be pursuant to the employee's official duties and thus unprotected by the First Amendment. <u>See, e.g.</u>, <u>Boyce v. Andrew</u>, 510 F.3d 1333 (11th Cir. 2007) (caseworkers investigating child abuse and neglect were speaking pursuant to official duties when they complained to supervisors and union that they were overworked and expressed concern over the potential harm to the children as a result). For example, the employees themselves concede that their initial requests for SSO data were unprotected by the First Amendment <u>because the requests were made as part of an effort to do their jobs</u> - not because their jobs specifically required them to speak. Indeed, it is undisputed that before their FOG duties were expanded to include ascertaining the cause of SSOs, the employees were <u>discouraged</u> from requesting SSO data in order to draft FOG ordinances. Therefore, it is clear that the actual position advocated by both the employees and my dissent is that we must examine, among other things, whether a public employee's job duties have any connection

pursuant to job duties, no matter how many feathers that speech ruffles and no matter what activity prompts the employee to make the speech. I believe this is the crucial distinction the <u>Garcetti</u> opinion, read as a whole, explicitly directs us to make – even if making that distinction means that certain statements in a "report" are protected while others are not.

I believe the record is clear that the employees were not speaking pursuant to their official duties, but rather as concerned citizens, when they complained about the reporting, posting, and remediation of SSOs. The majority relies on an overly broad reading of <u>Garcetti</u> – specifically, the Court's one-time use of the phrase "owes its existence to" – to deny First Amendment protection to the employees' speech, and in doing so sidesteps decades of Supreme Court precedent. I would therefore reverse the district court's grant of judgment on the pleadings to the supervisors and remand for further fact finding.

---

with the subject about which the employee speaks, not whether the job actually mandates the act of speaking. A DeKalb County employee in the Construction and Maintenance Unit responsible for reporting, posting, and remediating SSOs certainly could not argue that his complaint about the failure to report, post, or remediate SSOs is protected by the First Amendment because he was not officially required to <u>complain</u>. In other words, it is not just that the employees in this case had no duty to speak about a failure to report, post, or remediate SSOs – they had no duties related to that subject whatsoever.