[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14149
_____

D.C. Docket No. 1:12-cv-01899-WCO


MELISSA A. ALVES,
COREY M. ARRANZ,
SANDRINE M. BOSSHARDT,
KENSA K. GUNTER, and
ALAYCIA D. REID,

                                        Plaintiffs - Appellants,


versus


BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA,
JILL LEE-BARBER, in her individual capacity, and
DOUGLAS F. COVEY, in his individual capacity,

                                        Defendants - Appellees.


_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(October 29, 2015)

Before WILSON and MARTIN, Circuit Judges, and HODGES,[*] District Judge.

WILSON, Circuit Judge:

On this appeal, we consider whether a written grievance by five university employees alleging mismanagement by their supervisor which preceded their termination is entitled to First Amendment protection.  Appellants Melissa A. Alves, Corey M. Arranz, Sandrine M. Bosshardt, Kensa K. Gunter, and Alaycia D. Reid (collectively, Appellants) are clinical psychologists and former full-time staff employees at the Georgia State University (the University) Counseling and Testing Center (the Center).  In 2012, they were terminated through a purported reduction-in-force by Dr. Jill Lee-Barber, the Director of the Center, and Dr. Douglass F. Covey, the Vice President of Student Affairs.  According to Appellants, the reduction in force was mere pretext.  They were terminated, they say, in retaliation for submitting a Memorandum to University officials complaining about what they perceived to be poor leadership and mismanagement by Dr. Lee-Barber.  Appellants say their Memorandum amounts to citizen speech on a matter of public concern, which would be protected by the First Amendment, and that their retaliatory termination thus violated the Constitution.  The district court found, however, that the Appellants' Memorandum constituted employee speech on an issue related to their professional duties, which would not be subject to First

---

[*] Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of Florida, sitting by designation.

2

Amendment protection, and granted summary judgment to Appellees on that ground.  We affirm the judgment.

## I.

In August 2009, the University hired Dr. Lee-Barber as its Director of Psychological and Health Services.  Dr. Lee-Barber was tasked with administrative and supervisory responsibility over three departments: the student health clinic, student health promotion, and the Center.

### A.  The Center

The Center provided clinical services to the student body, including psychological counseling, testing, and assessment, and operated a training program for doctoral students, which included pre-doctoral internships, a practicum training program for doctoral students, and post-doctoral fellowships.

The mental health services provided by staff at the Center included, among other things, initial consultations, individual and couples counseling, group counseling, nutrition consultations, mental health outreach, and faculty and staff consultations.  As of 2011, upward of fifty percent of the Center's clinical services were provided by trainees in the Center's training program.  Candidates for the Center's training program were recruited through national "feeder programs" managed by the Center's staff.

3

The Center was also tasked with conducting mandatory psychological assessments of students who were identified by the Office of the Dean of Students as individuals who had the potential to cause harm to themselves or to others. The assessments were performed through the University's Mandated Safety Assessment Program, which was administered by certain staff at the Center. A student deemed a "safety concern" by the Office of the Dean of Students was referred by the Office of the Dean of Students to the Center for evaluation through the Program. Students identified as "safety concerns" might be excluded from on-campus housing or continued enrollment at the University. The Director of the Center was tasked with coordinating assessment efforts with the Office of the Dean of Students.

## B. The Staff

Dr. Lee-Barber assumed her role as Director of the Center in 2009. In that capacity, Dr. Lee-Barber oversaw the Center's programs, managed the Center's operations, and served as the liaison between the Center and the Office of the Dean of Students with regard to the Mandated Safety Assessment Program. Dr. Lee-Barber reported to Dr. Rebecca Stout, Associate Vice President for Student Affairs and Dean of Students, who, in turn, reported to Dr. Douglass Covey, Vice President of Student Affairs.

4

When Dr. Lee-Barber assumed her role as Director, Appellants were employed as full-time staff and clinical psychologists at the Center. Appellants' responsibilities at the Center were expansive and varied, and, given the nature of Appellants' retaliation claim, a brief summary of each of Appellants' roles is in order.

Dr. Arranz was the Crisis Response Coordinator for and a clinical psychologist at the Center. He helped develop the University's Mandated Safety Assessment Program and formulate the procedures used in assessing a student's risk of violence through the Program. Among other things, Dr. Arranz oversaw the Center's crisis services, provided training on crisis procedures to staff and trainees, supervised interns, students, and trainees, and conducted mandated assessments.

Dr. Reid was the Assistant Director of Training and a clinical psychologist at the Center. Her duties included, among other things, providing clinical services, assisting in the coordination of clinical services, supervising senior staff psychologists and trainees, serving as the Associate Director on Duty when the Director of the Center was unavailable, serving as a consultant to the Office of the Dean of Students, assisting in the development of policies and procedures for the Center, and conducting mandated assessments. Dr. Reid also served as an adjunct professor at the University.

5

Dr. Bosshardt was the Coordinator of Mind-Body Programs and a clinical psychologist at the Center. She was the Center's liaison to the International Student Services and the University Health Clinic. Dr. Bosshardt also performed the general duties of a staff psychologist, which included individual and group therapy, outreach services, individual supervision for trainees, and weekly crisis walk-in hours. She also served as a member of the Center's Clinical Task Force and Executive Training Committee.

Dr. Alves served as the Center's Internship Training Director and was a clinical psychologist at the Center. In addition to providing general clinical services to the University community, Dr. Alves also provided "educational instruction" to trainees, supervised interns, post-doctoral students, and practicum students, and served on numerous committees, including the Center's Executive Committee (an "upper administrative level" committee).

Dr. Gunter, the fifth and final Appellant, joined the Center as the Outreach Coordinator before transitioning to Coordinator of Practicum Training. In the latter role, Dr. Gunter served as the primary point of contact for practicum students. She was also the Center's liaison to the University's Athletic Department, the primary provider of sports psychology and counseling services, and, as of 2010, Chair of the Center's Diversity Committee and Co-Chair of the Cultural Competency Conference Planning Committee.

6

The Center's staff also included several professionals and trainees who are not parties to this appeal, including clinical psychologist Dr. Rachel Kieran, the Center's sexual and gender diversity coordinator; Dr. Pegah Moghaddam, a senior staff psychologist and the Center's group therapy coordinator; and clinical psychologist Dr. Yared Alemu, who served as the interim Assistant Director of Clinical Services and on the Center's mandatory assessment team with Drs. Reid and Arranz.

### C.  The Speech

On or about October 18, 2011, Dr. Gunter met with the University's Office of Opportunity Development and Diversity Education Planning (ODDEP).  The ODDEP deals with issues of discrimination within the University community.  In the meeting, Dr. Gunter expressed concerns regarding Dr. Lee-Barber's management of the Center and an interest in filing a complaint against Dr. Lee-Barber.  An intake form completed by Dr. Gunter listed the bases for her complaint as race and age unfairness, "potential hostile work environment," and "retaliation for stating that [Dr. Lee-Barber's] behavior was hypocritical."  Other "not discrimination based" issues included personnel issues, increasing office conflict, and unfair treatment.  Dr. Gunter ultimately did not file a complaint.

On October 25, 2011, Appellants and two other full-time psychologists, Drs. Moghaddam and Alemu, submitted a formal, written memorandum of concern to

7

University officials regarding Dr. Lee-Barber's management of the Center (the Memorandum).[1]  The Memorandum was addressed to Drs. Covey and Stout—Dr. Lee-Barber's immediate supervisors—and was copied to the Senior Vice President for Academic Affairs and Provost, the University Attorney in the Office of Legal Affairs, and Dr. Lee-Barber.

In the Memorandum, Appellants alleged that Dr. Lee-Barber's leadership and management of the Center adversely impacted client care and jeopardized the reputation of the Center.  They complained that Dr. Lee-Barber had created an unstable work environment that prevented staff from "effectively carry[ing] out all aspects of their work" and from "optimally perform[ing] daily required tasks[,] including the ability to collaboratively manage risk."  Appellants expressly stated that the Memorandum was "not an employee grievance," but rather "a documentation of identifiable behaviors . . . that jeopardize[d] the programs" offered by the Center.  The Memorandum then set forth five areas of general concern:

1.    *Deficiencies in Managing Center Operations*:  Appellants alleged that Dr. Lee-Barber demonstrated "a fundamental misunderstanding" of the Center's

---

[1] The Memorandum was jointly drafted, signed, and submitted by seven signatories using one voice.  Drs. Moghaddam and Alemu, however, resigned from their positions at the Center prior to the reduction in force that was the impetus for the instant action.  Appellants are the five remaining signatories and the only signatories asserting a claim for retaliation.  Therefore, in the interests of clarity and continuity, we will refer to statements and assertions made in the Memorandum as being made by "Appellants" rather than "the signatories."

client population and "deficiencies in her ideological approach to" the services provided by the Center. They further contended that Dr. Lee-Barber lacked "knowledge in the areas of complex psychopathology," was ineffective "in dealing with campus collaborators," and had an "inability to advocate for the appropriate use of psychologists' skills in conducting [the mandated safety risk] assessments," which "significantly compromise[d] the [Center's] ability to effectively manage risk and crisis." Appellants claimed that Dr. Lee-Barber's "lack of assessment skills" posed "problems in recognizing risk" and that her "lack of understanding about the nuances of the mandated program . . . contributed to her misinforming staff about when and how to use the mandated process."

2.    *Failure to Maintain Positive Trainee Relationships*: Appellants alleged that the Center's "quality relationships" with feeder programs and its overall reputation were critical to its "ability to attract, recruit, and retain trainees." They claimed that Dr. Lee-Barber's "management style" had created "rifts" in the Center's relationships with its feeder programs and that the Associate Director of Training [Dr. Reid] had to "step in and manage the damage." They also relayed "concerns" voiced by trainees regarding Dr. Lee-Barber's "communication style," "lack of authenticity," and "apparent confusion" about "some policies and procedure," her "inappropriate comments" about the physical attractiveness of one trainee, and other "negative nonverbal" behavior such as "eye-rolling."

9

3. *Questionable Competence in Management of Center Resources*: Appellants alleged that "Dr. Lee-Barber's management of personnel, which is the primary clinical resource of the Center, [had] been a significant problem." They questioned "Dr. Lee-Barber's emotional and professional stability" given her "pervasive pattern" of "significant" emotional outbursts. Dr. Lee-Barber allegedly failed to adhere "to the boundaries of the professional relationship" in one-on-one meetings with staff members wherein she would "discuss her feelings" about other employees. Appellants catalogued Dr. Lee-Barber's difficulty in considering feedback from others and staunch maintenance of a "singular vision" for the Center. They also complained that Dr. Lee-Barber had a "preoccupation" with staff members taking notes during staff meetings and that Dr. Lee-Barber's management style "undermine[d] open communication."

4. *Witness Tampering and Influence*: Appellants alleged that Dr. Lee-Barber sought to influence the testimony of at least three staff members who were witnesses in a tenure revocation proceeding involving the former Associate Clinical Director of the Center by "encouraging" the three staff members to only provide information that "could support the University's position." She allegedly told one staff member, "We need to support the President [of the University]," and she "exhibited frustration" in discussing the proceedings with another. Appellants

10

postulated that Dr. Lee-Barber was "misusing" her "authority and power in encouraging a certain level of participation" in the revocation proceedings.

5.    *Differential Treatment of Staff of Color*:  Appellants also alleged that Dr. Lee-Barber responded differently to "staff of color" than to "white-identified staff."  They stated that Dr. Lee-Barber would complain when "staff of color" used portable electronic devices to take notes in staff meetings, but she did not complain when "white-identified staff" did the same.  They further alleged that Dr. Lee-Barber "routinely commented" on the tone of voice and body language of "staff of color," but she did not make the same comments to "white-identified staff."

Appellants asserted that, in addition to raising awareness about their concerns, the Memorandum served "as a request for an investigation of [Appellants'] concerns in order to remedy the . . . crisis in leadership and management" at the Center.  To this end, Appellants directed the Memorandum "to those that would appear to have the most need to know and best opportunity to investigate and correct the problems [they had] observed."

### D.  The University's Response

Dr. Covey appointed two senior staff members, Carol Clark, Assistant Vice President for Student Affairs, and William Walker, Director of Student Affairs, to investigate Appellants' concerns.  Between November and December 2011, Clark and Walker interviewed each of the Appellants.  Clark and Walker also asked each

Appellant to submit an individual statement detailing the specific complaints in the Memorandum of which he or she had personal knowledge.[2]

In January 2012, Dr. Covey met with Appellants to inform them that Clark and Walker had found insufficient evidence to substantiate their concerns. Copies of a final investigative report prepared by Clark and Walker were forwarded to Appellants on February 3, 2012. The report stated that Appellants' "negative attitudes and dissatisfaction seem[ed] to be due to the desire of some of the staff to run the Center in the collaborative clinical services model that was used by the former director." Clark and Walker also reported a "strong resistance" to change and a "reluctance to follow directions" among the Center's staff. In the end, Dr. Covey determined that no action would be taken against Dr. Lee-Barber.

Within a week after the final report was issued to Appellants, Dr. Lee-Barber made the unilateral decision to cancel the Center's practicum training program and the Center's participation in the national matching program for interns. Dr. Lee-Barber asserted that the changes were due to an accreditation

---

[2] On December 15, 2011, Drs. Alves, Arranz, Gunter, Moghaddam, and Reid submitted a complaint to the ODDEP. They complained that Clark and Walker "were biased, made inappropriate and/or insensitive comments, and [they] felt that due process was not offered to [either side]" during the investigation. They also alleged Dr. Lee-Barber had "creat[ed] a hostile work environment, unfairly enforce[d] departmental policy, retaliated against some of the [staff] for taking their concerns to the Division leadership . . . , discriminated against some of the employees due to their race and/or sexual identity, bullied, mobbed, and participated in favoritism." Linda Nelson, Assistant Vice President for the ODDEP, investigated the psychologists' complaint. She found no evidence of racial discrimination and concluded that Clark and Walker's investigation was not conducted improperly.

standard that recommended that no more than forty percent of the Center's clientele be seen by trainees. The cancellations eliminated many of the job duties of Drs. Reid, Gunter, and Alves.

In the days between February 10 and March 2, Drs. Lee-Barber and Covey, with assistance from other University officials, also made the decision to implement a reduction in force that would eliminate the entire staff of full-time psychologists—all but one of whom were signatories to the Memorandum. University officials intended to outsource the clinical services provided at the Center to contract psychologists to allegedly lower the costs associated with running the Center. On March 2, 2012, Appellants (along with a full-time psychologist who was not a signatory to the Memorandum) were terminated.

## E.  The District Court Proceedings

On April 20, 2012, Appellants filed a complaint in state court against Dr. Lee-Barber, Dr. Covey, and the Board of Regents of the University System of Georgia (collectively, Appellees). The action was removed to federal court. Appellants' complaint asserted four counts, including a claim under 42 U.S.C. § 1983 for retaliation in violation of the First Amendment of the United States Constitution and a claim for the same under the Georgia State Constitution. After discovery, Appellees moved for summary judgment on all claims. The district

13

court granted Appellees' motion as to Appellants' free speech claims and denied it with leave to renew as to Appellants' other claims.

The district court held that Appellants' speech was not protected speech because Appellants spoke as employees on private matters rather than as citizens on matters of public concern.  The court rejected Appellants' characterization of the Memorandum as limited in scope to the Center's management of risk and crisis, reasoning that "[t]he fact that one issue raised in the [Memorandum]— mandatory risk assessments—might reflect on public safety or public policy is not sufficient to bring the entire [Memorandum] within the ambit of 'public concern,' particularly given the fact that the remainder of the Memorandum addressed employment issues."  It found that Appellants' complaints addressed the manner in which Dr. Lee-Barber's management style affected Appellants as employees, not how her management of the Center impacted public health and safety.  In the absence of constitutional protection, the district court granted summary judgment to Appellees on Appellants' free speech claims.

Appellants timely filed this instant appeal.[3]

**II.**

---

[3] After the district court entered its order and prior to filing this appeal, Appellants filed a consent order to amend their complaint to withdraw their remaining claims, terminating the case below.  Appellants filed their notice of appeal in this court following entry of judgment on Appellants' freedom of speech claims below.  *See* 28 U.S.C. § 1291; *see also Barfield v. Brierton*, 883 F.2d 923, 930 (11th Cir. 1989).

14

We review an order granting summary judgment de novo, applying the same legal standards that bound the district court. *Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1219 (11th Cir. 2015). As such, we will not affirm a grant of summary judgment unless the movant has shown that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted). In our review, "[a]ll evidence must be viewed in the light most favorable to the party opposing the motion for summary judgment." *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (internal quotations marks omitted). We do not weigh conflicting evidence or make credibility determinations, and we draw "[a]ll reasonable inferences arising from the undisputed facts . . . in favor of the nonmovant." *Id.* (internal quotation marks omitted).

### III.

A government employer may not demote or discharge a public employee in retaliation for speech protected by the First Amendment. *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989). While a citizen who enters public service "must accept certain limitations on [her] freedom[s]," *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 1958 (2006), she does not "relinquish the First Amendment rights [she] would otherwise enjoy as [a citizen] to comment on matters of public interest," *Pickering v. Bd. of Educ.*, 391 U.S. 563,

15

568, 88 S. Ct. 1731, 1734 (1968).  Thus, the aim is to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."  *Id.* at 568, 88 S. Ct. at 1734–35.

## A.

The Supreme Court sets forth a two-step inquiry into whether the speech of a public employee is constitutionally protected:

> The first requires determining whether the employee spoke as a citizen on a matter of public concern.  If the answer is no, the employee has no First Amendment cause of action based on . . . her employer's reaction to the speech.  If the answer is yes, then the possibility of a First Amendment claim arises.  The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public [based on the government's interests as an employer].

*Garcetti*, 547 U.S. at 418, 126 S. Ct. at 1958 (citations omitted) (identifying, from *Pickering* and its progeny, "two inquiries to guide interpretation of the constitutional protections accorded to public employee speech").  Both steps are questions of law for the court to resolve.  *See, e.g.*, *Moss v. City of Pembroke Pines*, 782 F.3d 613, 618 (11th Cir. 2015); *Battle v. Bd. of Regents*, 468 F.3d 755, 760 (11th Cir. 2006) (per curiam).  This appeal turns on the first step: "whether the

16

employee[s] spoke as . . . citizen[s] on a matter of public concern."[4]  *Garcetti*, 547 U.S. at 418, 126 S. Ct. at 1958.

This threshold inquiry is comprised of two requirements.  For her speech to be constitutionally protected, an employee must have spoken (1) as a citizen and (2) on a matter of public concern.  *See, e.g.*, *Boyce*, 510 F.3d at 1342.  *Garcetti*'s "threshold layer" looks at both the "role the speaker occupied" and "the content of the speech" to determine whether the government retaliation at issue warrants the *Pickering* analysis.  *See Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008) (internal quotation marks omitted); *see also Garcetti*, 547 U.S. at 417, 126 S. Ct. at 1957 ("[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern.").

Under *Garcetti* and its progeny, a court must consider the balance of public and private interests articulated in *Pickering* only when the employee speaks "as a

_____

[4] Following *Pickering*, our analysis of a public employee's claim that her employer's disciplinary action was in retaliation for constitutionally protected speech has had four parts, requiring an employee to show that "(1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities [i.e., the *Pickering* balance]; and (3) the speech played a substantial part in the adverse employment action."  *Cook  v. Gwinnett Cty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005).  If the employee satisfies her burden on these first three parts, (4) the burden shifts to the employer to show that it would have made the same employment decision even in the absence of the protected speech.  *Id.*  The first two parts are questions of law to determine whether the employee's speech is protected; the last two parts are questions of fact that address the causal link between the speech and the adverse employment action.  *See id.*; *see also Battle*, 468 F.3d at 760.  After *Garcetti*, we modified the first step in our four-part analysis to account for *Garcetti*'s two-step inquiry.  *See, e.g.*, *Boyce v. Andrew*, 510 F.3d 1333, 1342 (11th Cir. 2007) (per curiam).  Thus, the first part of this circuit's *Pickering* analysis now asks whether the employee spoke as a citizen *and* whether the speech involved a matter of public concern.  *See id.*; *see also Vila v. Padrón*, 484 F.3d 1334, 1339 (11th Cir. 2007).

17

citizen." *See Boyce*, 510 F.3d at 1342–43; *Vila*, 484 F.3d at 1339; *see also Garcetti*, 547 U.S. at 423, 126 S. Ct. at 1961. If the employee spoke as a citizen and on a matter of public concern, "the possibility of a First Amendment claim arises," and the inquiry becomes one of balance, *see Garcetti*, 547 U.S. at 418, 126 S. Ct. at 1958; on the other hand, if the employee spoke as an employee and on matters of personal interest, the First Amendment is not implicated, and "the constitutional inquiry ends with no consideration of the *Pickering* test," *see Boyce*, 510 F.3d at 1343. The First Amendment will step in to safeguard a public employee's right, *as a citizen*, to participate in discussions involving public affairs, but "it [will] not empower [her] to 'constitutionalize the employee grievance.'" *Garcetti*, 547 U.S. at 420, 126 S. Ct. at 1959 (quoting *Connick v. Myers*, 461 U.S. 138, 154, 103 S. Ct. 1684, 1694 (1983)).

## B.

As to the "citizen" requirement, the Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S. Ct. at 1960. In *Garcetti*, the Court found that an internal memorandum written by a deputy district attorney "pursuant to his duties" did not constitute speech as a citizen and was thus unprotected. *Id.*

18

Because the attorney in *Garcetti* conceded that his written statements were made "pursuant to his employment duties," the Court "ha[d] no occasion to articulate a comprehensive framework" for determining just what the Court meant by the phrase "pursuant to his employment duties." *See id.* at 424, 126 S. Ct. at 1961. Given the circumstances, the Court observed:

> The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 424–25, 126 S. Ct. at 1961–62.

Under *Garcetti*, "[t]he central inquiry is whether the speech at issue 'owes its existence' to the employee's professional responsibilities." *Moss*, 782 F.3d at 618 (quoting *Garcetti*, 547 U.S. at 421, 126 S. Ct. at 1960); *see Abdur-Rahman v. Walker*, 567 F.3d 1278, 1283 (11th Cir. 2009); *Boyce*, 510 F.3d at 1342. Practical factors that may be relevant to, but are *not* dispositive of, the inquiry include the employee's job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee's job. *See Moss*, 782 F.3d at 618. As *Garcetti* instructed, the "controlling factor" is whether the employee's statements or expressions were made "pursuant to [her] official duties." *Garcetti*, 547 U.S. at 421, 126 S. Ct. at 1959–60.

19

The Supreme Court recently revisited *Garcetti* in *Lane v. Franks*, 573 U.S. __, 134 S. Ct. 2369 (2014).  In *Lane*, the Court found that "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes."  *Lane*, 134 S. Ct. at 2378.  The Court noted that the subpoenaed testimony at issue in *Lane* was "far removed from the speech at issue in *Garcetti*."  *Id.* at 2379.  The communication in *Lane* was separate and apart from the employee's obligations to his employer, *see id.*, while the memorandum in *Garcetti* was commissioned by the employer, *Garcetti*, 547 U.S. at 422, 126 S. Ct. at 1960.  The fact that Lane "learned of the subject matter of his testimony in the course of his employment" could not *alone* transform his "sworn testimony speech as a citizen" into employee speech on par with *Garcetti*'s employer-commissioned speech.  *See Lane*, 134 S. Ct. at 2379 ("[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee . . . speech.").

The Court noted that, in finding that the employee's memorandum was "made pursuant to [his] official responsibilities" in *Garcetti*, the Court "said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment."  *Lane*, 134 S. Ct. at 2379 (internal quotation marks omitted).  Indeed, in *Garcetti*, the Court "made explicit that its holding did not turn on the fact that the memo at issue concerned the

20

subject matter of the prosecutor's employment, because the First Amendment protects some expressions related to the speaker's job." *Id.* (internal quotation marks omitted).  Thus, in *Lane*, the Court reiterated that "[t]he critical question under *Garcetti* is whether the speech at issue is *itself* ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* (emphasis added); *see Garcetti*, 547 U.S. at 421–22, 126 S. Ct. at 1960 (defining speech made pursuant to an employee's job duties as "speech that owes its existence to a public employee's professional responsibilities" and speech the "employer itself has commissioned or created").

After *Lane*, the exception to First Amendment protection in *Garcetti* for "speech that owes its existence to a public employee's professional responsibilities," *Garcetti*, 547 U.S. at 421–22, 126 S. Ct. at 1960, must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment.

## C.

The second requirement—that the speech address a matter of public concern—concerns the context of the speech and asks whether the employee spoke on a matter of public concern or on matters of only personal interest.  *See, e.g.*, *Boyce*, 510 F.3d at 1342–43.  To fall within the realm of "public concern," an

employee's speech must relate to "any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S. Ct. at 1690; *see Snyder v. Phelps*, 562 U.S. 443, 453, 131 S. Ct. 1207, 1216 (2011) (including within the ambit of "public concern" speech that "is a subject of legitimate news interest . . . [or] a subject of general interest and of value and concern to the public" (internal quotation marks omitted)). The inquiry turns on "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S. Ct. at 1690.

In determining whether the purpose of the employee's speech was to raise issues of public concern or to further her own private interest, we have recognized that "an employee's speech will rarely be entirely private or entirely public." *E.g.*, *Akins v. Fulton Cty.*, 420 F.3d 1293, 1304 (11th Cir. 2005) (internal quotation marks omitted). Therefore, in reviewing the whole record, "[w]e ask whether the main thrust of the speech in question is essentially public in nature or private." *Vila*, 484 F.3d at 1340 (internal quotation marks omitted); *see Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993) (per curiam) ("Rather than categorize each phrase the employee uttered, we consider whether the speech at issue was made primarily in the employee's role as citizen, or primarily in the role of employee." (internal quotation marks omitted)). If the "main thrust" of a public employee's speech is

22

on a matter of public concern, the speech is protected. *See Morgan*, 6 F.3d at 754–55.

A court may also consider the employee's attempt to make her concerns public along with the employee's motivation in speaking. *See id.* at 754; *Vila*, 484 F.3d at 1339. However, "a court cannot determine that an utterance is not a matter of public concern *solely* because the employee does not air the concerns to the public." *See Morgan*, 6 F.3d at 754 n.5; *see also Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir. 1988) ("[F]ocusing solely on [an employee's efforts to communicate her concerns to the public], or on the employee's motivation, does not fully reflect the Supreme Court's directive that the content, form, and context of the speech must all be considered."). Thus, whether the speech at issue was communicated to the public or privately to an individual is relevant—but not dispositive.

\* \* \*

Given Appellants' heavy reliance on *Lane*, we think a quick word on that case's impact on our precedent is in order. *Lane* focuses on the "citizen" aspect of the *Garcetti* analysis. In *Lane*, the Court held that the First Amendment "protects a public employee who provide[s] truthful sworn testimony, compelled by subpoena," where testifying in court proceedings is outside the scope of the employee's "ordinary job responsibilities." *Lane*, 134 S. Ct. at 2374–75. In so holding, the Court relied specifically on the nature of compelled testimony. *Id.* at

23

2379–80.  It found that any obligations an employee may have, as an employee, to her government employer are "distinct and independent from the obligation, as a citizen, to speak the truth" when offering sworn testimony in judicial proceedings. *Id.* at 2378–79 (noting "the obligation borne by all witnesses testifying under oath").  This "independent obligation" rendered the employee's sworn testimony "speech as a citizen and set[] it apart from speech made purely in the capacity of an employee."  *Id.* at 2379.

The Court's holding in *Lane* is a narrow one.  Because it was "undisputed that [the employee's] ordinary job responsibilities did not include testifying in court proceedings," the Court "decide[d] only whether truthful sworn testimony that is not a part of an employee's ordinary job responsibilities is citizen speech on a matter of public concern."  *Id.* at 2378 n.4.  *Lane* reinforces *Garcetti*'s holding that a public employee may speak as a citizen even if his speech involves the subject matter of his employment and clarifies the critical inquiry for retaliation claims.  *See Lane*, 134 S. Ct. at 2379.  The Court's repeated use of the term "ordinary" in reference to the phrase "job duties," *see, e.g.*, *id.* at 2375, 2377–78, and its confirmation that speech that merely concerns information acquired in the course of employment is not "employee speech" narrowed the field of employee speech left unprotected by *Garcetti*—but this is not a substantial shift in the law.  It is, if anything, a slight modification and a useful clarification.

## IV.

Here, Appellants challenge the district court's determination that they spoke as employees on matters related to the mission of their public employer—and not as citizens on matters of public concern. They offer three main reasons why their Memorandum constitutes protected speech: (1) Appellants took action that was not required by any job duty; (2) the Memorandum's protests impacted matters of public concern, including "the safety and well-being of students" and "client care"; and (3) Appellants directed their concerns to persons "well outside [their] chain of command." Appellees counter that Appellants' speech owed its existence to Appellants' ordinary job duties and that the Memorandum was nothing more than an internal complaint submitted to Dr. Lee-Barber's supervisors complaining about Dr. Lee-Barber's managerial style. We find that Appellants spoke as employees about matters of only personal interest, and their speech is therefore beyond the protection of the First Amendment.

## A.

We first look to whether Appellants spoke as citizens or as employees. *See Garcetti*, 547 U.S. at 418, 126 S. Ct. at 1958; *Boyce*, 510 F.3d at 1342. According to Appellants, their speech owed its existence to their job responsibilities only to the extent that they would not otherwise have been in a position to know of the matters about which they complained. They argue that their ordinary job duties

25

did not include raising ethical issues, protesting their supervisor's professional incompetence "in the area of mandated assessments," or critiquing the Center's operations. Appellants contend that individual counseling was their "primary job," and, while certain Appellants had "limited administrative/supervisory duties," Appellants were not charged with "ultimate responsibility of the Center's programs" and were not "ultimately responsible for its operations." In short, Appellants argue that because they were not paid to offer a referendum on Dr. Lee-Barber's management or the Center's operations, their Memorandum does not amount to employee speech. *Cf. Garcetti*, 547 U.S. at 421–22, 126 S. Ct. at 1959–60.

As the Supreme Court observed in *Garcetti*, formal job descriptions "often bear little resemblance to the duties an employee actually is expected to perform." *Id.* at 424–25, 126 S. Ct. at 1962. Instead, *Garcetti* and its progeny require a "functional review" of an employee's speech in relation to her duties or responsibilities. *See Abdur-Rahman*, 567 F.3d at 1285. Here, Appellants claim that their only employment duties related to individual counseling and *some* administration and supervision. These duties, as described by Appellants, can be read narrowly so as not to mandate the act of speaking, but such a reading would disregard the actual activities engaged in by Appellants at the Center as well as the purpose served by the Memorandum.

26

As a group, Appellants supervised employees, trainees, and other staff; trained interns, candidates, and practicum students; assessed at-risk students; and counseled individuals, couples, and groups.  Dr. Arranz was the Crisis Response Coordinator for the Center; he helped develop both the Mandated Safety Assessment Program and the procedures used in assessing a student through the Program.  Dr. Reid was the Associate Director on Duty when Dr. Lee-Barber was unavailable; she also supervised staff and trainees, assisted in the coordination of clinical services, and was a consultant to the Office of the Dean of Students.  Dr. Alves was the Internship Training Director and served on the Center's Executive Committee.  Dr. Gunter was the Coordinator of Practicum Training, and Dr. Bosshardt coordinated the Center's Mind-Body programs—both provided general clinical services.  More than a few of Appellants, then, served in supervisory roles at and managed programs administered by the Center.

The Memorandum details how Dr. Lee-Barber's conduct affected Appellants' ability to fulfill these roles.  Drs. Arranz and Reid performed mandated assessments; Appellants stated that Dr. Lee-Barber's lack of necessary knowledge compromised their ability to perform these mandated assessments and to manage risk and crisis.  Dr. Reid assisted in the development of policies and procedures for the Center; Appellants complained that Dr. Lee-Barber lacked understanding about "some" of the Center's policies and procedures.  Drs. Reid, Alves, Gunter, and, to

27

some extent, Arranz supervised, trained, and recruited candidates into the Center's training programs; Appellants complained that Dr. Lee-Barber's mismanagement impacted the Center's ability to recruit and retain qualified candidates. Appellants provided clinical services to the student body, faculty, and staff at the University; Appellants complained that Dr. Lee-Barber was an incompetent manager of personnel, "the primary clinical resource of the Center." In short, each complaint or concern relates back to Appellants' ordinary duties.

Activities undertaken in the course of performing one's job are activities undertaken "pursuant to employment responsibilities." *See Garcetti*, 547 U.S. at 422–24, 126 S. Ct. at 1960–61. Appellants raised concerns about Dr. Lee-Barber in the course of performing—or, more accurately, in the course of *trying* to perform—their ordinary roles as coordinators, psychologists, committee members, and supervisors. Each complaint in the Memorandum was made in furtherance of their ability to fulfill their duties with the goal of correcting Dr. Lee-Barber's alleged mismanagement, which interfered with Appellants' ability to perform. *See D'Angelo v. Sch. Bd.*, 497 F.3d 1203, 1210–12 (11th Cir. 2007) (finding high-ranking employee's broad administrative responsibilities rendered speech "to fulfill his professional duties" unprotected); *see also Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009) ("[Employee's speech] was an attempt to ensure proper implementation of [his duties] and was therefore offered pursuant to his job

28

duties."). While the Memorandum does not bear the hallmarks of daily activity, it was drafted and submitted by Appellants in the course of carrying out their daily activities. *See, e.g.*, *Paske v. Fitzgerald*, 785 F.3d 977, 984 (5th Cir. 2015) ("When speech-related activities are required by one's position or undertaken in the course of performing one's job, they are within the scope of the employee's duties." (internal quotation marks omitted)), *petition for cert. docketed*, No. 15-162 (Aug. 5, 2015). Thus, it is evident that Appellants' speech "owes its existence" to their professional responsibilities, *Garcetti*, 547 U.S. at 421, 126 S. Ct. at 1960, and it "cannot reasonably be divorced from those responsibilities," *Abdur-Rahman*, 567 F.3d at 1283.

Further, we do not agree that speech regarding conduct that interferes with an employee's job responsibilities is not itself ordinarily within the scope of the employee's duties. Implicit in Appellants' duty to perform their roles as psychologists, committee members, supervisors, and coordinators is the duty to inform, as Appellants put it, "those that would appear to have the most need to know and best opportunity to investigate and correct" the barriers to Appellants' performance. For example, in *Boyce*, two employees at the Department of Family and Children Services complained to their supervisors about the size of their caseloads, which they viewed to be the result of mismanagement of internal administrative affairs. 510 F.3d at 1344–45. The plaintiffs were case workers;

29

they were responsible for investigating the cases of children allegedly at risk and making recommendations to their supervisors. *Id.* at 1336, 1343. Still, we found that the plaintiffs spoke "pursuant to [their] employment responsibilities" in reporting conduct that affected the plaintiffs' ability to manage their cases, close cases, and meet deadlines. *Id.* at 1345–46 (internal quotation marks omitted). In other words, in reporting conduct that interfered with their ordinary job duties, the plaintiffs in *Boyce* spoke pursuant to those duties. And the same is true of Appellants here.

Because Appellants spoke as employees, not as citizens, their Memorandum does not implicate the First Amendment. *See id.* at 1343.

## B.

Our inquiry could—but does not—end here.[5] Under *Garcetti*'s second threshold prong, we next ask whether Appellants' speech "addressed an issue relating to the mission of [the Center] or a matter of public concern." *See id.* at 1342. Appellants acknowledge that some of their protests "were directed to personal employment situations," but they argue that the "main thrust" of their Memorandum was the treatment of student mental health issues by the Center and

[5] Having determined that Appellants spoke as employees, we need not ask whether the subject matter of Appellants' speech was a topic of public concern. *See Boyce*, 510 F.3d at 1343. However, the "citizen" inquiry and the "public concern" inquiry are closely intertwined. *See Lane*, 134 S. Ct. at 2379–80 (emphasizing special value of employee speech in determining citizen-employee inquiry); *see also Abdur-Rahman*, 567 F.3d at 1283–86; *Boyce*, 510 F.3d at 1343–47. Thus, we think it would better serve the parties if we address both prongs of the *Garcetti* analysis.

30

the impact of that treatment on student health.  The district court correctly concluded, however, that the form, content, and context of the Memorandum, as construed in the light most favorable to Appellants, indicate that Appellants were speaking as employees on conduct that interfered with their job responsibilities, rather than as citizens on matters of social, political, or other civic concern.[6]  *See Connick*, 461 U.S. at 146, 103 S. Ct. at 1690.

After *Connick*, "courts have found speech that concerns internal administration of the educational system and personal grievances will not receive constitutional protection."  *Maples v. Martin*, 858 F.2d 1546, 1552 (11th Cir. 1988); *see Ferrara v. Mills*, 781 F.2d 1508, 1516 (11th Cir. 1986) (finding teacher's complaints about manner of course registration and course assignments unprotected).  "However, [an employee] whose speech directly affects the public's perception of the quality of education in a given academic system find[s her] speech protected."  *Maples*, 858 F.2d at 1553.  Further, while speech that "touch[es] upon a matter of public concern" may be considered protected speech, *see Connick*, 461 U.S. at 149, 103 S. Ct. at 1691, our determination must be based

---

[6] Appellants request "credit" for statements within the Memorandum that the Memorandum "[was] not an employee grievance" and "not merely [a compilation of] employee grievances."  While we are required to view the facts in the light most favorable to Appellants as the nonmoving parties, *Ave. CLO Fund, Ltd.*, 723 F.3d at 1294, such statements are not "facts."  Rather, such statements are conclusions designed to have legally operative effects.  *See, e.g.*, *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).  While we appreciate Appellants' characterization of their speech, it is the province of the court to determine whether the Memorandum is an employee grievance.  *See, e.g.*, *Moss*, 782 F.3d at 618 (stating that both prongs of *Garcetti* are questions of law).

31

on the record as a whole, *see id.* at 147–48, 103 S. Ct. at 1690; *see also Abdur-Rahman*, 567 F.3d at 1284 (cannot consider facts in isolation).

In this case, we find that Appellants' speech did not constitute speech on a matter of public concern. Their Memorandum is focused on their view that Dr. Lee-Barber is a poor leader and a deficient manager, and how Dr. Lee-Barber's conduct adversely affected them and other employees of the Center. *See, e.g.*, *Watkins v. Bowden*, 105 F.3d 1344, 1353 (11th Cir. 1997) (per curiam) (finding employee's complaints about how colleagues behaved toward her and how that behavior affected her work were not protected). The Memorandum sets forth a litany of complaints, including that Dr. Lee-Barber interfered with Appellants' "ability to optimally perform daily required tasks," mismanaged personnel, failed to maintain positive relationships with trainees, was hostile to feedback, encouraged certain testimony in pending tenure revocation proceedings, and treated "staff of color" differently from "white-identified staff."[7]

Appellants contend that, even if many of their complaints are private in nature, the Memorandum as a whole is grounded in the public interest. They contend that the sufficiency of mental health services provided by public institutions to students, faculty, and staff is a matter of extreme public importance.

---

[7] If the speech at issue was Appellants' truthful testimony at the subject tenure revocation proceeding, *Lane* might require a conclusion different from the one that we reach today. However, Appellants' stated concern was Dr. Lee-Barber's alleged "misuse of her authority and power in encouraging a certain level of participation" in the revocation proceedings. Neither Appellants' testimony nor the proceedings themselves are discussed in the Memorandum.

These public concerns, they argue, are reflected in their complaints about Dr. Lee-Barber's deficient management of Center operations and failure to maintain positive trainee relationships, both of which Appellants contend affect the quality of services provided by the Center and jeopardize the Center's reputation.  We recognize that the question of what constitutes proper care in the treatment of mental health issues is a matter worthy of a public forum.  But, we find that, while the Memorandum may touch up against matters of public concern, it is not directed to such concerns.  *See, e.g.*, *Boyce*, 510 F.3d at 1344–45.

In its introductory remarks, the Memorandum makes vague and sweeping references to "an adverse impact on client care," "the safety and well-being of students," and the Center's "ability to provide a safe environment to . . . students," without reference to specific instances in which the Center failed to effectively manage risk or to provide quality care.  On the other hand, the Memorandum goes into great detail and offers specific examples when addressing Appellants' personal grievances and frustrations with Dr. Lee-Barber's management of the Center.  It refers to Dr. Lee-Barber's deficient ideological approach to clinical work, refusal to address staff concerns, poor communication style, "singular way of examining issues," and displays of "significant emotional distress."  *See, e.g.*, *Mpoy v. Rhee*, 758 F.3d 285, 291 (D.C. Cir. 2014) ("[Unprotected speech] list[ed] a litany of complaints indicating that the school, and particularly its principal, had

33

been interfering with [the employee's] 'primary duty.'"). Appellants sought a "stable work environment" to enable them to "carry out all aspects of their work" and "to optimally perform daily required tasks." Upon a careful reading, the public simply does not factor into Appellants' concerns.

We have said before that "the relevant inquiry is not whether the public would be *interested* in the topic of the speech at issue," it is "whether the *purpose* of [the employee's] speech was to raise issues of public concern." *Maggio v. Sipple*, 211 F.3d 1346, 1353 (11th Cir. 2000) (emphases added) (internal quotation marks omitted); *see also Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir. 1985) (*Connick* "requires us to look at the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?"). Appellants' speech, while ostensibly intertwined with the services provided by the Center, was not intended to address a matter of public concern from the perspective of a citizen. *See Boyce*, 510 F.3d at 1344–45. It was only incident to voicing their personal concerns that Appellants' remarks touched upon matters that might potentially affect the student body. *See Pearson v. Macon-Bibb Cty. Hosp. Auth.*, 952 F.2d 1274, 1278 (11th Cir. 1992); *see also Gomez v. Tex. Dep't of Mental Health & Mental Retardation*, 794 F.2d 1018, 1022 (5th Cir. 1986) ("Whatever the significance of [the] speech . . . , he was not

34

seeking to alert the public to any actual or potential wrongdoing or breach of the public trust . . . .").  The "main thrust" of the Memorandum's content "took the form of a private employee grievance."  *Morgan*, 6 F.3d at 755.

Given its form and context, Appellants' Memorandum did not relate to a matter of public concern.  As to form, Appellants used the Memorandum as an internal channel through which they could, in their capacities as employees at the Center, relay to Dr. Lee-Barber's supervisors and other University officials what they believed to be Dr. Lee-Barber's deficient management and poor leadership.

Also, although not dispositive to our inquiry, Appellants made no attempt to make their concerns public.  *See id.* at 754; *Kurtz*, 855 F.2d at 727.  The issues outlined in the Memorandum were raised, discussed, investigated, and resolved privately, *see Connick*, 461 U.S. at 148 n.8, 103 S. Ct. at 1691 n.8, and without any intervention from or communication with outside persons or agencies, *cf. Pickering*, 391 U.S. at 564, 88 S. Ct. at 1732–33 (employee sent letter to local newspaper); *Akins*, 420 F.3d at 1304 (employee requested special meeting with public official); *Maples*, 858 F.2d at 1549 (employee's criticisms published in public report).  Accordingly, the means by which Appellants communicated their concerns further supports that this was a private employee grievance.

V.

35

We find that the district court correctly concluded that the speech for which the Appellants seek First Amendment protection was made by them as employees and not as citizens, and on matters related to their employment and not public concern.  Therefore, the district court's grant of summary judgment to Appellees is **AFFIRMED**.

MARTIN, Circuit Judge, dissenting:

The Majority concludes that several psychologists who work in Georgia State University's Counseling and Testing Center ("Center") were speaking as employees, rather than citizens, when they criticized the practices of that Center's Director. The Majority also holds that these criticisms are not a matter of public concern. I believe the First Amendment affords more protection to public employees than the Majority opinion allows, and I would reverse the District Court's grant of summary judgment to the University. It is for that reason I respectfully dissent.

The Supreme Court regularly reminds us that "public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417, 126 S. Ct. 1951, 1957 (2006). For example in Lane v. Franks, ___ U.S. ___, 134 S. Ct. 2369 (2014), the Supreme Court reaffirmed that "speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." Id. at 2379. Given this "special value," Lane indicates that we should exercise care in applying Garcetti's exception to First Amendment protection.

37

In exercising this care, we ask two questions: first, whether the psychologists spoke as citizens; and second, whether their speech implicated a matter of public concern.  Moss v. City of Pembroke Pines, 782 F.3d 613, 617 (11th Cir. 2015). And as we always do in reviewing the grant of summary judgment, we "construe the facts and draw all inferences in the light most favorable to the nonmoving party."  Feliciano v. City of Miami Beach, 707 F.3d 1244, 1252 (11th Cir. 2013) (quotation omitted).  The District Court and the Majority answer "no" to both questions.  My answer is "yes" to both, so I write to explain how I part ways with my colleagues.

## I.

As I said, in order to receive First Amendment protection, the psychologists must first have spoken as citizens rather than employees.  The Supreme Court recently gave us guidance about how to answer this question.  In Lane v. Franks, our Circuit held that Mr. Lane's sworn testimony was employee speech because he "learned of the subject matter of his testimony in the course of his employment." 134 S. Ct. at 2379.  We were wrong.[1]  In reversing the judgment of this Court, the Supreme Court told us that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech."  Id.  Rather, "[t]he critical

---

[1] Since I was on the panel of this court that decided Lane, I suppose another way to say it is I was wrong.

38

question under <u>Garcetti</u> is whether the speech at issue is itself <u>ordinarily</u> within the scope of an employee's duties, not whether it merely concerns those duties." <u>Id.</u> (emphasis added).[2]

The Majority is, of course, correct when it says that after <u>Lane</u>, <u>Garcetti</u>'s exception to First Amendment protection must be construed narrowly to encompass only "speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment." But I do not see that the Majority applies its own enunciation of the rule. Instead, the Majority broadly reasons that an employee is unprotected when she speaks about conduct that in some way interferes with her ordinary job responsibilities. But this does not give sufficient weight to <u>Lane</u>'s clarification of our First Amendment precedent.

It is clear to me that the psychologists' speech was not "ordinarily within the scope of [their] duties." <u>Id.</u> As set forth in the Magistrate Judge's Report and Recommendation, their duties included "providing counseling services to the GSU population, conducting mandatory risk assessments of students of concern, and supervising and training the individuals within the [Center's] training and practicum programs." According to their sworn declarations, the psychologists

---

[2] The District Court did not mention <u>Lane</u> in its order denying First Amendment protection to the psychologists, and therefore seems not to have benefited from the guidance the Supreme Court gave. Perhaps the parties' briefs did not refer to <u>Lane</u> because it had not been decided by the time the briefs were filed. However, <u>Lane</u> issued over two months before the District Court ruled and now gives us guidance for deciding this case.

were not responsible for critiquing or assessing the Center Director's performance and its impact on student mental health or the functioning of the Center. For instance, while Corey M. Arranz was the Center's Crisis Response Coordinator overseeing crisis services, he "was not charged with ultimate oversight of the [Center's] programs, . . . operations of the [Center] . . . [or] supervision, evaluation, critique, appraisal or reporting as to the performance of the director." Likewise, Melissa A. Alves noted that while she was responsible for therapy and consultations, as well as educational instruction and service on committees, she was not "ultimately responsible for operations at the [Center]," nor was she "responsible for supervision, evaluation, critique, appraisal or reporting as to the performance of the director." So too with the remaining Appellants—Sandrine M. Bosshardt, Kensa Gunter, and Alaycia Reid.[3]

No one really disputes that the psychologists had only limited supervisory duties. Nevertheless, the Majority suggests that even this limited supervisory role brings the psychologists' criticism of the Director's performance within their ordinary job responsibilities. But as nonmoving parties, the psychologists are entitled to have "[a]ll reasonable inferences arising from the undisputed facts" drawn in their favor. Ave. CLO Fund, Ltd. v. Bank of Am., N.A., 723 F.3d 1287, 1294 (11th Cir. 2013) (quotation omitted). The Majority's emphasis on its own

---

[3] At oral argument, counsel for the University agreed that these declarations were the primary evidence in the record concerning the psychologists' job duties.

40

view of the Appellants' supervisory roles is not therefore proper at the summary judgment stage.

I certainly recognize that parts of the Memorandum touched on the psychologists' job duties. The Memorandum asserts, for example, that "Dr. Lee-Barber's lack of knowledge in the areas of complex psychopathology and ineffectiveness in dealing with campus collaborators, and her inability to advocate for the appropriate use of psychologists' skills in conducting [mandatory student risk] assessments significantly compromises the [Center's] ability to effectively manage risk and crisis." The Memorandum also notes the Director's detrimental effect on the "[Center's] ability to attract, recruit, and retain trainees . . . [which] directly impacts the quantity and quality of service provision at the [Center]." The psychologists do not contest that counseling, risk assessment, and trainee recruitment were part of their ordinary responsibilities.

However, Lane tells us that the First Amendment protects the speech an employee makes outside of her ordinary obligations, even if it touches on those obligations. Public employees "are uniquely qualified to comment" on issues of public concern because of the knowledge they gain through their ordinary work responsibilities. Lane, 134 S. Ct. at 2380 (quotation omitted). Here, the psychologists spoke of their own duties only in the context of raising broader concerns about the effects of the Director's mismanagement. Specifically, the

41

psychologists said that the Director's practices impeded their ability to identify students who might be a risk to themselves or others and to provide effective counseling services.  I do not view these health and safety concerns as merely personal gripes or employment-related grievances.  See Cook v. Gwinnett Cty. Sch. Dist., 414 F.3d 1313, 1319 (11th Cir. 2005) (holding that a bus driver's concerns about "the safety of children due to bus overcrowding and the lack of time allotted for pre-trip bus inspections" were not merely "internal bus driver employment issues"); see also Peterson v. Atlanta Hous. Auth., 998 F.2d 904, 917 n.25 (11th Cir. 1993) ("Some issues may be obviously of public concern from their subject matter, for instance, an alleged health or safety risk.").  In contrast, the Majority concludes that the Appellants' ordinary duties included the obligation to make these criticisms.

In support of its conclusion, the Majority cites cases I see as easily distinguishable from this one.  D'Angelo v. School Board of Polk County, Florida, 497 F.3d 1203 (11th Cir. 2007), for example, is a quintessential "enumerated duty" case.  In D'Angelo, the school principal who was denied First Amendment protection admitted that he pursued charter conversion to improve the quality of education at his school.  This was one of his listed job responsibilities and indeed what he described as his "number one duty."  Id. at 1210 (quotation omitted).  In

42

contrast, our psychologists' jobs include no duty, either express or implied, to critique higher management on the broader issues they raised.

The Majority also cites Boyce v. Andrew, 510 F.3d 1333 (11th Cir. 2007) (per curiam), in which this Court held that internal complaints by social services case managers about the size of their caseloads were unprotected employee speech. Id. at 1343.  In so holding, we noted that the case managers' complaints focused on "their respective views that their caseloads were too high, which caused each not to meet expected deadlines, and their consequent need for assistance."  Id. at 1343–44.  Thus, "[t]he purpose of their grievances clearly was not to raise public awareness about children within the care of [their office]."  Id. at 1346.  Here, in contrast, the psychologists complained not about a routine aspect of their daily work, but about broader mismanagement and dysfunction at the Center.  In doing so, they spoke directly to the quality of services the Center offered to the University and its students.

The Majority also says that the psychologists spoke as employees because they reported conduct that related to their ability to fulfill their respective responsibilities.  This argument treads too closely to that affirmatively rejected by Lane.  The Supreme Court repeats the modifier "ordinary" nine times in the Lane opinion, emphasizing that an employee loses First Amendment protection only as to speech he undertakes in "perform[ing] the tasks he was paid to perform."  134

43

S. Ct. at 2379 (quoting Garcetti, 547 U.S. at 422, 126 S. Ct. at 1960).[4]  Lane's

holding strengthens Garcetti's "significant point" that First Amendment protection

should only be withheld from speech "commissioned or created" by the employer.

Garcetti, 547 U.S. at 421–422, 126 S. Ct. at 1960.  To say, as the Majority does,

that the psychologists spoke as employees because "each complaint or concern

relates back to Appellants' ordinary duties," seems to me to deny protection based

on "the mere fact that [the psychologists'] speech concerns information acquired

by virtue of [their] public employment."  Lane, 134 S. Ct. at 2379.[5]  Binding

Supreme Court precedent forbids this.

Although the Majority acknowledges Lane's import to some degree, it does

not apply its rule.  I read the Memorandum to address matters beyond the scope of

---

[4] At least two of our sister Circuits have interpreted this emphasis on "ordinary" job duties as potentially limiting the exception to First Amendment protection for employee speech even beyond what Garcetti envisions.  See Dougherty v. Sch. Dist. of Phil., 772 F.3d 979, 990 (3d Cir. 2014) ("If anything, Lane may broaden Garcetti's holding by including 'ordinary' as a modifier to the scope of an employee's job duties."); Mpoy v. Rhee, 758 F.3d 285, 295 (D.C. Cir. 2014) (noting that the repeated use of "ordinary" may limit "the realm of employee speech left unprotected by Garcetti").

[5] The only case the Majority cites that directly holds that an employee is unprotected when he reports conduct that "interferes with his job responsibilities" is Winder v. Erste, 566 F.3d 209, 215 (D.C. Cir. 2009).  However, the D.C. Circuit has since called Winder into doubt, noting that "it is possible that *Winder's* broad language, interpreting Garcetti as leaving an employee unprotected when he reports conduct that 'interferes with his job responsibilities,' . . . could be in tension with *Lane's* holding."  Mpoy, 758 F.3d at 294.  In the wake of Lane and the D.C. Circuit's own questioning of Winder's continued viability, I give this out-of-circuit precedent little weight.

44

the ordinary job duties of its writers, so I would hold that the psychologists spoke as citizens rather than employees.

## II.

The Majority also holds that the Memorandum does not implicate a matter of public concern. Speech involves matters of public concern when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." Connick v. Myers, 461 U.S. 138, 146, 103 S. Ct. 1684, 1690 (1983). To decide whether speech is a matter of public concern, we look at "the content, form, and context of a given statement, as revealed by the whole record." Id. at 147–48, 103 S. Ct. at 1690.

In Peterson, we found guidance in "a critical word in the Supreme Court's articulation of the standard, that is the word 'fairly.'" 998 F.2d at 916 (quoting Connick, 461 U.S. at 146, 103 S. Ct. at 1690). We explained that:

> the Supreme Court did not say that an employee's speech must be "definitively" or "clearly" or "indisputably" characterized as a matter of public concern. . . .  If it is capable of being fairly so characterized, then dismissal on summary judgment without examination of the evidence supporting the claim is inappropriate.

Id.  The Majority acknowledges that "the question of what constitutes proper care in the treatment of mental health issues is a matter worthy of a public forum." Nevertheless, the Majority holds that the "main thrust" of the psychologists' speech was voicing private grievances against the Director. But given that they

also advanced health and safety issues that can be "fairly" considered matters of public concern, summary judgment was not properly entered against them.

No doubt some of the problems set out in the Memorandum relate to the impact the Director's conduct had on how the psychologists carried out their job duties.  However, we have held that if employee speech "contained some matters of public interest in addition to . . . personal attacks, the personal nature of the speech would not, standing alone, be sufficient to render the speech private." Mitchell v. Hillsborough Cty., 468 F.3d 1276, 1285 n.22 (11th Cir. 2006) (emphasis added).  On this record, I believe there is a "sufficient quantum of content touching a matter of public concern" to support the Appellants' First Amendment claim.  Id.

The University recognized at oral argument that the Memorandum contained "some matters of concern."  For example, early in the Memorandum, the psychologists emphasize that the Director's conduct has caused "an adverse impact on client care and has jeopardized the reputation of the Center both in the GSU community and with community collaborators."  The Memorandum also mentions that these failings "jeopardize the programs, contribute to and cause waste of resources and capital, risk the safety and well-being of students served by the programs and threaten the integrity of the administrative and extra-judicial processes inherent in our governance."

46

The enumerated grievances also connect the Director's conduct to the quality of services the Center provides.  In the section on trainee relationships, the psychologists express concern that "any rifts in our relationships or reputation [as a training center] directly impacts the quantity and quality of service provision at the [Center]."  In the section on management of Center resources, they raise the concern that the Director's lack of knowledge "directly impacts the development of policies and procedures necessary to create an effective system by which to meet the service demands of the students and the University community."  Even though the psychologists do reference their own grievances, they return throughout the Memorandum to the Director's impact on the quality of mental health services delivered by the Center.  Clearly, in my view, the Memorandum contains both matters of public and private concern.

In Connick, the Supreme Court confronted comparable facts.  Connick presented the question of whether an Assistant District Attorney's questionnaire to other attorneys in the office involved matters of public concern.  Id. at 140–42, 103 S. Ct. at 1686–87.  Although the Supreme Court found that most of the employee's questions were "mere extensions of [her] dispute over her transfer to another section of the criminal court," it ruled that one question, asking whether Assistant District Attorneys felt pressure to work on political campaigns, touched upon a matter of public concern.  Id. at 148, 103 S. Ct. at 1690.  Despite the primarily

47

personal nature of the questionnaire, the Supreme Court proceeded to the next part of the Pickering analysis based on that one question.  Id. at 149, 103 S. Ct. at 1691.

This Court's decision in Maples v. Martin, 858 F.2d 1546 (11th Cir. 1988), is also instructive.  There, we considered whether a report that included results of a survey of professors in the Mechanical Engineering Department at Auburn University involved matters of public concern.  Id. at 1549.  A "main concern" of the report was decidedly private in nature: "the lack of faculty involvement in administrative decisionmaking and the 'morale problem' in the Department."  Id. Indeed, "[t]he tone of the [report] was extremely critical of the Department Head." Id.  Still, this Court held that "while critical of the way the . . . Department ha[d] been managed by the Department Head," the report also touched on issues of public concern like the curriculum, facilities, and performance of graduates.  Id. at 1553.  In other words, it was enough that "[a]t least part of the motivation for . . . publishing the [report] was to alert both the administration and other interested parties of the problems the Department was facing in providing . . . students with an adequate engineering education."  Id.  Our Court concluded that "the appellants were sincere in their efforts to alert the public to the conditions of [the] Department, even if that concern was co-mingled with criticism of the Department Head's management style."  Id.  I would extend the reasoning from Maples to this case and credit the psychologists with sincerely attempting to inform the public

48

about the declining quality of health services at the Center.  I would so hold, even though their Memorandum included some complaints of a more private nature.

My conclusion is not altered by the fact that the Appellants' Memorandum was distributed internally.  As the Supreme Court tells us, the fact that an employee "expressed his views inside his office, rather than publicly, is not dispositive."  Garcetti, 547 U.S. at 420, 126 S. Ct. at 1959; see also Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 415–16, 99 S. Ct. 693, 696–97 (1979) ("The First Amendment forbids abridgment of the 'freedom of speech.'  Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.").  Beyond that, the psychologists addressed the Memorandum to those at the highest levels of the University's administration— including the Provost, the Dean of Students, and the Vice President for Student Affairs.  Their concerns were not directed to the human resources department. This manner of publication also weighs in favor of treating their speech as relating to matters of public concern.  After all, "[t]here is considerable value . . . in encouraging, rather than inhibiting speech by public employees."  Lane, 134 S. Ct. at 2377.  First Amendment principles do not require us to penalize an employee for choosing to first alert those within the University's administration to alleged mismanagement before seeking to publicly embarrass the University.

49

III.

I believe these psychologists were speaking as citizens on a matter of public concern. Were my view to prevail, we would reverse and remand for the District Court to consider whether the University "had an adequate justification for treating the [psychologists] differently from any other member[s] of the public based on the [its] needs as an employer." Id. at 2380 (quotation omitted). If the District Court held that the psychologists' First Amendment interests outweighed the University's needs, the psychologists would then be entitled to have a jury consider their case that their speech was a "substantial motivating factor" in their termination. Moss, 782 F.3d at 618. Likewise, the University would have an opportunity to prove that it would have terminated the psychologists even absent their speech. Id. Maybe the psychologists would succeed before a jury—maybe not. But, at this stage in the analysis, I understand Supreme Court precedent to characterize their Memorandum as citizen speech on a matter of public concern. Therefore I respectfully dissent.

50